## MID-CONTINENT PETROLEUM CORP. v. BLACKWELL OIL & GAS CO.

No. 19321.   Opinion Filed April 12, 1932.

Rehearing Denied and Dissenting Opinion Filed Sept. 6, 1932.

Application for Leave to File Second Petition for Rehearing Denied Oct. 25, 1932.

J. P. Greve, I. L. Lockewitz, H. M. Gray, F. C. Duvall, J. C. Denton, J. H. Crocker, and R. H. Wills, for plaintiff in error.

H. S. Gurley, Bierer & Bierer, and Ames, Cochran, Ames & Monnet, for defendant in error.

Harry O. Glasser, amicus curiae.

ANDREWS, J. The plaintiff in error, who hereinafter will be referred to either as the plaintiff or as the oil company, commenced this action against the defendant in error, who hereinafter will be referred to either as the defendant or as the gas company, for the purpose of obtaining a decree adjudging the oil company to be entitled to all of the drip gasoline theretofore and thereafter caught in a gasoline drip installed in the operation of what is known as the Martin Well No. 2. The value of the product to April, 1926, was said to be $78,185.68.

Under date of August 4, 1916, the owners of certain real estate granted, demised, leased, and let the same to the Marland Oil Company for the sole and only purpose of mining and operating for oil and gas, and laying pipe lines, and building tanks, power-stations and structures thereon, to produce, save, and take care of said products for a term of five years and as long thereafter as oil or gas or either of them is produced from said land by the lessee. In consideration of the premises, the lessee covenanted and agreed:

"First. To deliver to the credit of lessor, free of cost, in the pipe line to which he may connect his wells, the equal one-eighth part of all oil produced and saved from the leased premises.

"Second. To pay the lessor $300 each year in advance, for the gas from each well where gas only is found, while the same is being used off the premises, and lessor to have gas free of cost from any such well for all stoves and all inside lights in the principal dwelling houses on said land during the same time by making his own connections with the wells at his own risk and expense.

"Third. To pay lessor for gas produced from any oil well and used off the premises at the rate of $50 per year, for the time during which such gas shall be used, said payments to be made each three months in advance."

It was therein provided that if no well be commenced on the land on or before the 4th day of August, 1917, the lease should terminate as to both parties, unless the lessee on or before that date should pay or tender to the lessor, or to the lessor's credit in the bank therein named, or its successors, the sum of $80, which amount was intended to operate as a rental and covered the privilege of deferring the commencement of a well for twelve months from said date, and it was further provided therein that in like manner and upon like payments or tenders the commencement of a well might be further deferred for like periods of the same number of months successively. That oil and gas lease remained in force during all of the time hereinafter mentioned. All of the rights which the Marland Oil Company acquired by virtue of that oil and gas mining lease were assigned to the oil company, the plaintiff herein, under date of September 21, 1916. On the 29th day of November, 1920, the oil company and the gas company entered into a contract which, with the acknowledgment and signatures omitted, was in words and figures as follows, to wit:

"Contract.

"This Agreement, entered into this 29th day of November, 1920, by and between the Cosden Oil & Gas Company, hereinafter called the 'Oil Company,' and the Blackwell Oil & Gas Company, hereinafter called the 'Gas Company.'

"Witnesseth: That, whereas, on the 4th day of August, 1916, Roy W. Martin, Ola E. Martin, and Nelson P. Martin executed to the Marland Oil Company one certain oil and gas mining lease covering the (Description of real estate omitted) which lease is recorded in book 7, at page 207, of the records in the office of the county clerk of Grant county, Okla., and which lease was thereafter by said Marland Oil Company assigned to the Cosden Oil & Gas Company, herein styled the 'Oil Company':

"Now, therefore, for and in consideration of the money hereinafter stipulated to be paid and the matters and things stipulated and covenanted to be done and performed by the gas company, the oil company hereby assigns and conveys unto the said gas company all of its gas rights (but no oil rights except as hereinafter provided) in, under and pertaining to the above-described leased property.

"In consideration of the foregoing assignment, the gas company agrees to immediately put material upon the ground for a well in the northwest corner of said tract offsetting the present producing well on adjoining property, and to commence drilling said well within four (4) weeks from this date. The gas company agrees to promptly offset each and every other gas well or wells which may be drilled at any time in the future on any tract adjoining the tract hereby assigned and to fully and completely protect said tract from drainage of the gas therefrom by any such offset wells.

"It is further agreed that if in drilling any well for gas the gas company shall reach a sand showing oil, then, before drilling into such sand, the gas company shall immediately notify the oil company in writing of such fact, in order that the oil company may have its representative on the ground while the sand is being drilled, and shall defer the drilling into such sand until the oil company's representative is present; but in no event shall the gas company be required to delay such drilling in such case more than two days. In case such oil sand is encountered, the gas company may, after complying with the aforementioned requirements, drill through such sand if it desire to test deeper sand for gas, but shall in such case fully protect the sand so drilled through in full compliance with the laws of Oklahoma and the rules and regulations of the Corporation Commission of Oklahoma. If the gas company shall encounter oil sand as hereinbefore mentioned and shall not desire to drill through the same for a deeper test, then if it be not a flowing well, the gas company shall put said well to pumping; and if it shall produce twenty-five (25) barrels of oil or more per day for thirty (30) consecutive days, the oil company shall take over said oil well, paying said gas company the cost of said well. Whereupon all material in said well and the oil theretofore produced therefrom shall become the property of the oil company. If, however, during the aforementioned test, said well shall produce less than twenty-five (25) barrels per day, then the oil company may, at its option, take over said well at cost as above provided; and in case it shall not exercise its option to do so within sixty (60) days after receiving written notice from the gas company that it has such oil well, such well shall then become the property of the gas company, which latter company may proceed to produce and sell oil therefrom for its own account, operating said well and accounting for royalties upon the oil produced as provided in said lease; or, at its option, may abandon said well.

"It is further agreed that if in drilling any well for oil on the above-mentioned leased tract, the oil company shall encounter a sand producing gas, it shall immediately notify the gas company in writing of such fact, so that the gas company may have a representative present to test the volume of the gas, and said gas company shall have two days after such notice within which to have its representative present before drilling through such sand. Thereupon the oil company shall have the right, if it so desire, to drill such well through such sand and to a deeper sand to test for oil, but in such event the oil company shall be required to protect such gas sand in full compliance with the laws of the state of Oklahoma. If, however, upon encountering such gas sand the oil company shall not desire to drill the well through such sand to test deeper sands for oil, then, if the well shall

have a capacity of two million (2,000,000) cubic feet per day, or over, from said sand, the gas company shall take over said well paying therefor to the oil company the entire cost of such well. If the initial volume of gas produced from said gas sand shall be less than two million (2,000,000) cubic feet per day, then the gas company may, at its option, take over such gas well paying to the oil company the entire cost thereof, but in case the gas company shall not exercise such option within fifteen (15) days from the receipt of written notice from the oil company of the striking of such sand, then the oil company shall have the right to either retain said well and sell gas therefrom, or to abandon the same, as it may elect. If the oil company shall not abandon said well but shall keep the same as a gas well, the gas company agrees to buy from the oil company, at the price below provided, the maximum amount of gas permitted to be sold from said well under the laws of Oklahoma, so long as the gas company shall have a gas line within one-half (½) mile from such well.

"The gas company agrees to pay from time to time to royalty owners all payments due as royalty on account of the gas produced from said lease; and further agrees to commence taking gas from said lease within ninety (90) days after the completion of the first well by the gas company upon said leased tract. The gas company further agrees to set a meter upon said leased property through which all gas taken shall be measured, and to pay to the oil company at the rate of seven (7) cents per thousand cubic feet for one-eighth (⅛) of the volume of gas taken by it from said leased premises. under this assignment, the said seven cents per thousand cubic feet being the market price now paid by the Oklahoma National Gas Company for gas purchased from the field in which this tract is located. It is further understood and agreed by and between the parties hereto that should the market price paid by the Oklahoma National Gas Company for gas in this field be increased or decreased from the present rate of seven cents per thousand cubic feet, then the amount to be paid by the gas company to the oil company for one-eighth of the volume of gas so taken shall be increased or decreased accordingly.

"The gas company agrees to make a statement to the oil company not later than the 10th of each month, showing the amount of gas taken from said leased premises during the previous month. and to make payment therefor to the oil company according to the provisions of this contract not later than the 20th of the month succeeding that in which the gas is taken.

"In case any question should arise between the parties hereto as to the correctness of the meter readings on such gas, it is agreed that the oil company may secure the services of a meter man of recognized qualifica-

tions to take such readings, and if in the opinion of such meter man such readings are incorrect, the same shall be corrected according to the findings of such meter man, and payments for gas shall be made therefor according to the corrected and adjusted meter readings.

"This asignment and contract shall continue in force as long as gas shall be produced in paying quantities from said leased tract by the gas company, but in no event shall said lease be considered as not producing gas in, paying quantities so long as it shall produce sufficient gas to enable the gas company, under the laws of Oklahoma and the rules and regulations of the Corporation Commission of the state of Oklahoma, to take therefrom not less than 500,-000 cubic feet of gas per day; said gas company, however, having the right to continue taking gas therefrom under this contract so long as it shall be enabled to produce gas therefrom in any quantity."

Thereafter the gas company, acting under its contract with the oil company, drilled two wells on the premises. The first well, after being operated for sometime by the gas company as a gas well, was drilled to a greater depth and became an oil well. It is not in issue in this case. The second well was completed by the gas company on April 21, 1923. It produced a large amount of natural gas of a heavy rock pressure. The gas company installed at or near the mouth of the well what is called a "pinch gate," which consisted of a valve in the gas line by which it was able to reduce the pressure of the gas in the pipe line below what it was in the casing in the well. The gas company installed a meter on its line at a distance of about 125 or 150 feet from the well. The gas company installed between the meter and the pinch gate what is known as a "drip". The change in the pressure and temperature caused by the installation and operation of the pinch gate caused a portion of the gasoline coming from the well in the form of a gas to liquify and the drip operated to collect the gasoline so liquified and to retain it in its liquid form. The gas company from time to time drew the liquid gasoline from the drip. It amounted to several hundred gallons per day, being about one-half of a gallon of gasoline to each one thousand cubic feet of gas. The drip was maintained until about June 13, 1925, when the gas company moved its meter to a point between the drip and pinch gate, where it remained until November 14, 1925, when it was removed and the entire product then passed through the meter until sometime during the progress of the trial, when the defendant reinstalled the drip between the pinch gate and the meter. The record shows that the installation of a drip is customary for the purpose of removing from gas any fluid carried with the gas, to prevent the fluid from passing into and through the meter and into the gas lines beyond it.

The gas company paid the oil company for the volume of one-eighth of the gas as measured by the meter. It did not pay the oil company anything for the gasoline which it acquired and it refused to do so.

The question for our determination is: Who is entitled to the gasoline taken by the gas company from the drip? In order to determine the question, we must look to the contract between the gas company and the oil company and ascertain from it the answer to the question. In doing so, we must interpret the contract in accordance with the rules adopted by the Legislature. Under the provisions of section 5039, C. O. S. 1921, a contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful. Subject to that provision, the contract being in writing, the intention of the parties must be ascertained from the writing alone, if possible (section 5042, C. O. S. 1921), and the language of the contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity. Section 5041, C. O. S. 1921. The whole of the contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others (section 5044, C. O. S. 1921), and the contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties. Section 5046, C. O. S. 1921. However broad may be the terms of the contract, it must be held to extend only to those things concerning which it appears that the parties intended to contract. Section 5051, C. O. S. 1921. It is the duty of the court to construe contracts as written and not to enlarge upon the contract or to make a new contract for the parties regarding matters upon which their minds have not met. Phillips v. Henderson Gasoline Co., 101 Okla. 277, 225 P. 668. The intention of the parties must be deduced from the entire agreement, not from any part or parts of it, and, where a contract has several stipulations, the intention of the contracting parties is not expressed by any single clause or stipulation, but by every part and provision in it, which must all be considered together, and so construed as to be consistent with every other part. Hammett Oil Co. v. Gypsy Oil Co., 95 Okla. 235, 218 P. 501.

The contract must be examined under those rules to determine whether it is an assignment and conveyance by the oil company to the gas company of all of the gas rights of the oil company under the oil and gas lease, as contended by the gas company, or a contract for the development and operation of the property and a sale of the gas passing through the meter, as contended by the oil company. That question must first be determined, for if the contract is an assignment and conveyance of an interest in the oil and gas lease, the rights and liabilities of the parties are materially different from what they are if it was a contract for the development and operation of the property and a sale of the gas passing through the meter. If it was the first, the right of the oil company to the gas ceased at the time of the execution and delivery of the contract and thereafter the oil company was entitled only to receive the consideration agreed to be paid at the time and in the amount and manner therein specified. If it was the latter, the rights of the oil company in the gas did not cease until the gas passed through the meter.

That the words "assigns and conveys" were used in the contract does not make the instrument an assignment and conveyance. Such is the effect of the many decisions of this court construing instruments to be mortgages of real estate which, by their terms, grant, bargain, sell and convey real estate. Such was the holding in Phillips v. Henderson Gasoline Co., supra, wherein the language used was "bargain, grant and sell;" in Smith v. Pulaski Oil Co., 88 Okla. 47, 211 P. 1047, in which the language used was "sell, transfer and convey," and in other decisions of this court.

We are not concerned with the names and the terms used. If we were, we would look to the title of the instrument, which we would find to be "Contract."

When we look at the contract within its four corners, we find that the oil company did not assign and convey to the gas company all of its gas rights under the oil and gas lease. It retained the right to drill wells on the premises, and though it encountered a sand producing gas, it retained the right, if it so desired to drill the well through that sand to a deeper sand to test for oil. While it agreed that if it did not desire to drill the well through such a sand to test deeper sands for oil, the gas company might take over the well by paying to the oil company the entire cost of such a well, the gas company was not required to do so unless the production of gas was two million cubic feet per day, or over, it being left optional with the gas company whether it should take over a gas well with a production of less than two million cubic feet per day. It was provided that in case the gas company should not exercise its option to take over a gas well within 15 days from receipt of a written notice from the oil company of the striking of such gas sand, the oil company should have the right either to retain the well as a gas well and to sell gas therefrom, or to abandon the same, as it might elect. It should not be contended that the gas company would own the gas from that well, for it would belong to the oil company after the gas company had failed to exercise its option to take over the well from the oil company. In the event that the oil company did not elect to abandon such a well and elected to keep the same as a gas well, the gas company agreed to buy from the oil company the maximum amount of gas permitted to be sold from said well under the laws of Oklahoma, so long as the gas company had a gas line within one-half mile of the well. Attention is called to that fact for the reason that, under the terms of the contract, the gas company agreed to pay to the oil company for gas taken by the gas company from a gas well belonging to the oil company the same amount per thousand cubic feet of gas taken that it agreed to pay to the oil company for the gas taken by the gas company from the gas well in question. We know of no reason why the gas company would agree to pay the oil company the same amount per thousand cubic feet for gas from a well that belonged to the gas company that it agreed to pay the oil company for gas from a well belonging to the oil company. In this connection we call attention to the fact that there is but one provision in the contract as to the method to be used in the taking of gas by the gas company from the premises and that that provision applies to the taking of gas from a gas well belonging to the oil company as well as to the taking of gas from the well in question. That provision is that the gas company will set a meter upon the leased premises through which all gas taken shall be measured.

If there is any question as to whether or not all of the gas rights of the oil company were assigned and conveyed to the gas company, it is answered by the last paragraph of the contract, in which it was provided that the contract shall continue in force as long as gas shall be produced in paying quantities from the leased tract by the gas company. The termination of the contract does not terminate the oil and gas mining lease. It is the property of the oil company by assignment from the lessee. After

the termination of the contract the oil company may thereafter produce gas from the leased premises under the provisions of the lease. If the gas company, by reason of the contract, is the owner of all of the gas rights under the lease, how does the oil company again acquire them? The answer is obvious. The instrument in question is a contract for the development and operation of the property and a sale of the gas passing through the meter. It is not an assignment and conveyance of all of the gas rights of the oil company under the oil and gas lease.

The gas company contends that the agreement to install a meter and to measure the gas taken by it through that meter was for the purpose of providing a method for determining the amount of money to be paid by the gas company to the oil company, and that the amount of money so paid was not only for the gas taken after it had passed through the meter, but for everything that came from the well whether or not it passed through the meter.

In Phillips v. Henderson Gasoline Co., supra, notwithstanding the provision of the contract involved therein by which the parties of the first part therein did thereby "bargain, grant and sell unto the party of the second part all of the casing-head gas produced from oil wells" located on the premises involved therein, this court held that "* * * the contract of the parties did not extend to drip gasoline that collected in the line and had to be withdrawn before the same reached the meter," and in support of its holding said:

"Under this state of facts, we think the court, first, misconstrued the contract in holding that under the contract the parties contemplated a sale of all the casinghead gas, whether in vaporous or in liquid form. There is nothing in the contract to even infer that the parties intended to purchase casinghead gasoline in liquid form, but, to the contrary, they were purchasing what was delivered through the meter in vaporous form. The court attempted to make a contract between the plaintiff and defendant regarding the drip gasoline and fix the manner of measuring the same and how it should be paid for by the defendant. In this the court committed error. The court should have construed the contract just as it is written, the defendant buying all the casing-head gas as it was delivered through the meter. This is what defendant was paying for, and this is what it was to receive. It is the duty of the court to construe the contract as written, and not to attempt to make a new contract for the parties"

—and:

"The first portion of the contract recites that defendant is purchasing all of the casinghead gas of the plaintiffs, and that plaintiff should install certain machinery or equipment, which in the instant case was certain gas lines, vacuum pumps, scrubbers and drips, and the gas then delivered to the gas line of the defendant. The contract then provides that it is mutually agreed that the amount of casinghead gas to be paid for shall be determined by connecting meters to intake lines of second party running to gas pumps of said first party. By construing these provisions together, what was the intent of the parties? The language and intent as derived from the contract was:

"First. That plaintiffs were desirous of selling their casinghead gas and the defendant was desirous of purchasing the same.

"Second. It was contemplated that the casinghead gas should be gathered, or taken from the well and pass through certain gas lines and apparatus, then into the line of defendant, where a meter was to be installed. The amount of casinghead gas passing through the meter was to be paid for at so much per thousand cubic feet. It is clear that plaintiffs were selling what passed through the meter, and the defendant was buying and paying for what passed through the meter. It also is clear that the parties contemplated that the gas should be generated from the wells in the usual and customary manner, and run through the apparatus or machinery that is usually and customarily installed in accordance with the custom in vogue in the oil fields. It would follow that all leakage, shrinkage, or waste removed from the gas in passing from the wells to the meter would be borne by the plaintiffs; all leakage, shrinkage, or waste after passing through the meter should be borne by the defendant. It would also follow that if there was value to the waste products that was necessary to be removed from the gas between the wells and meter, the same would belong to the plaintiffs, as it does not pass through the meter and is not measured by the meter, nor does the contract contain any provision regarding this waste product. If the parties made no contract regarding the waste product, then by construing the contract in accordance with section 5051, Comp. Stat. 1921, the contract would not extend to this subject-matter."

The contract in question shows that the oil company, the owner of the lease, desired to arrange for the production and disposition of the gas from the leased premises and that the gas company desired to procure the same. Gas was the object of the contract. It was the thing about which the parties intended to contract. It was the thing about which they did contract. They provided that all of the gas taken from the premises should be passed through a meter and that payment was to be made to the

oil company for the gas that passed through the meter. It is apparent that the parties contemplated that the gas should be taken in the usual and customary manner and through apparatus and machinery customarily installed for that purpose. The gas company contends that Phillips v. Henderson Gasoline Co., supra, is not in point, for the reason that in that case the well belonged to the seller, while, as it contends, in this case, the well in question belongs to the gas company, and that the difference in the ownership of the well requires a different rule to be applied. We are bound by the provisions of the contract in question. It provides an identical method for the taking and an identical rate of payment for gas taken by the gas company from a gas well owned by the oil company as it provides for gas taken by the gas company from the well in question. The rule stated in Phillips v. Henderson Gasoline Co., supra, would be applicable if gas was taken by the gas company from a gas well owned by the oil company. We are thereby confronted with the question of whether the parties intended a different rule to be applicable to gas taken by the gas company from a gas well owned by the oil company from what they intended to be applicable to gas taken by the gas company from the well in question. The parties did not provide a different rule. They agreed that the same rule would be applicable to each, and that the gas taken by the gas company from a gas well owned by the oil company should be handled in the same manner and paid for at the same rate as the gas taken by the gas company from the well in question. We think that the rule stated in Phillips v. Henderson Gasoline Co., supra, is applicable to the gas taken by the gas company from the well in question.

The contract involved in Smith v. Pulaski Oil Co., supra, provided that the first parties "* * * do hereby sell, transfer, and convey all of the gas now being produced, or that may be hereafter produced on said premises, to said second parties, * * *" and this court, notwithstanding that provision, held:

"Where the lessee in an oil and gas lease and another person enter into a contract in writing, by the terms of which all gas then being produced or that may thereafter be produced from a certain tract of land is by the lessee sold to such person, and which contract provides that whenever a well is drilled in and gas produced therefrom, such person at his option may elect to take the gas so produced from said well by furnishing the necessary casing, pipe, and bradenhead, to be placed in the well by the lessee to preserve and protect said gas, held, that

the lessee was not obliged to use any other methods or means of segregating or separating the gas from the oil than those provided for in the contract; held, further, that if casinghead gas could not be separated from the oil and delivered to such person in the manner provided for in the contract, it was not within the contemplation of the parties when the contract was made, and such person was not entitled thereto."

Therein this court said:

"If casinghead gas could not be separated from the oil and delivered to the plaintiffs in the manner provided for in the contract, then it must not have been such gas as was in contemplation of the parties when the contract was made."

That rule is applicable herein, and since the gasoline could not be delivered to the gas company in the manner provided for in the contract, that is, through the meter, we must hold in conformity with that decision that the gasoline was not such gas as was within the contemplation of the parties when the contract was made. When we look to the contract to determine the kind of gas covered by the provisions thereof, we may also look to the oil and gas lease by which the gas rights covered by the contract are defined. When we do so we find that the provision of the lease, with reference to gas from each well where gas only is found, provides that the lessor is "to have gas free of cost from any such well for all stoves and all inside lights in the principal dwelling house on said land. * * *" It cannot be said that the parties to the lease intended that the lessor was to have gas impregnated with readily condensable gasoline to the amount of one-half gallon to each one thousand cubic feet. The parties thereto evidently understood that the readily condensable gasoline in appreciable quantities was to be taken from the gas. Such was the evident intent of the contract in question. There is no provision in the contract by which it can be said that the gasoline was assigned or conveyed by the oil company to the gas company. Since it was not assigned and conveyed by the oil company to the gas company, it remained the property of the oil company, for, as held in George v. Curtain, 108 Okla. 281, 236 P. 876, all rights claimed under a contract, which are not conferred in direct terms, or by fair implication, are to be considered withheld. In that case this court said:

"It is the duty of the courts to construe contracts as written, and not to enlarge upon the contract and make new contracts for the parties regarding matter upon which their minds have not met."

Therein was involved casinghead gas. In the body of the opinion the court said:

"It will be observed that the parties contracted specifically regarding oil wells and gas wells and the contract is silent as to the disposition of gas produced from an oil well, and, therefore, a different rule obtains to the rule laid down by this court in the case of Mussellem v. Magnolia Petroleum Co., 107 Okla. 183, 231 P. 526, and followed by this court in the case of Pautler v. Franchot, 108 Okla. 130, 235 P. 209. In those cases the lease contracts specifically fixed the right of the parties where gas was used from an oil well, but where the lease contract in the case at bar was made prior to the time when casinghead gasoline was known to be of commercial value, and no mention made of the casinghead gas to be taken from the oil wells, we are forced to the conclusion that that subject was not within the contemplation of the parties when the lease contract was entered into, and is, therefore, not covered or controlled by said lease contract. Smith v. Pulaski, 88 Okla. 47, 211 P. 1047; Mullendore v. Minnehoma Oil Company, decided by this court Nov. 12, 1924."

That rule is applicable herein, for herein the parties contracted specifically regarding gas and the contract is silent as to gasoline. It will be noted that this court, in that case, distinguished it from the rule stated in Mussellem v. Magnolia Petroleum Co., 107 Okla. 183, 231 P. 526, and followed in Pautler v. Franchot, 108 Okla. 130, 235 P. 209. In the Mussellem Case appears the statement that dry natural gas is defined as "natural gas which does not contain an appreciable amount of readily condensable gasoline." The gas in question in this case contained an appreciable amount of readily condensable gasoline. It amounted to several hundred gallons per day, aggregating 720,640 gallons in amount and $78,185.68 in value to the date of computation, and being about one-half gallon of gasoline to each one thousand cubic feet of gas. The amount was caused, in part, as stated by the trial court, by "the richness" of the gas "in gasoline content." It was readily condensable, for it condensed at the first opportunity in a simple appliance installed for the purpose of removing waste, without the use of machinery, appliances and equipment commonly used for the manufacture of gasoline from casinghead gas or dry gas. In the Mussellem Case it was pointed out that the contract therein involved dealt with oil produced and saved, gas produced and saved from a gas well, and gas produced and saved from an oil well. Herein is involved a fourth element—gasoline coming from a gas well. Gasoline coming from a gas well is not referred to in the contract. There is a material difference between gasoline manufactured from gas by the use of machinery, appliances, and equipment constructed for that purpose, and

gasoline which comes from a well in a gaseous form in appreciable quantities and which is readily condensable without the use of machinery, appliances, and equipment intended for the manufacture of gasoline from gas.

In the language of this court in Phillips v. Henderson Gasoline Co., supra, it is clear that the oil company was selling what passed through the meter; that the gas company was buying and paying for what passed through the meter, and that the product removed from the drip did not belong to the gas company, but to the oil company. Under the authorities cited, it was the duty of the oil company to settle with the landowner for the gasoline produced and saved from the leased premises in accordance with the terms of the oil and gas lease. See, also, Mullendore v. Minnehoma Oil Co., 114 Okla. 251, 246 P. 837; Gilbreth v. State Oil Corp., 4 Fed. (2d) 262, and Wilson v. King Smith Refining Co., 119 Okla. 256, 250 P. 90.

The judgment of the trial court is reversed and the cause is remanded to that court, with directions to enter judgment in favor of the oil company in conformity herewith.

CLARK, V. C. J., and HEFNER, CULLISON, SWINDALL, and KORNEGAY, JJ., concur. LESTER, C. J., absent. RILEY and McNEILL, JJ., dissent.

---

McNEILL, J. (dissenting). I do not concur in the opinion rendered in this case. The parties will be referred to as they appeared in the trial court. On August 4, 1916, Roy W. Martin et al. leased to the Marland Oil Company the north half of the southwest quarter of section 23, township 27, range 3, west I. M. in Grant county. The lease was on the ordinary 88 form. On August 4, 1916, the Marland Oil Company assigned all of its rights under this lease to the Cosden Oil Company, and thereafter, on November 20, 1920, the Cosden Oil Company assigned all of its gas rights in said land to the Blackwell Oil & Gas Company. This contract of assignment contained the following:

"Now, therefore, for and in consideration of the money hereinafter stipulated to be paid and the matters and things stipulated and covenanted to be done and performed by the gas company, the oil company hereby assigns and conveys unto the said gas company all of its gas rights (but no oil rights, except as hereinafter provided) in, under, and pertaining to the above-described lease property."

The assignment has other provisions, but in my opinion, it amounts to a straight as-

signment of the gas rights under the original lease to the Blackwell Oil & Gas Company in praesenti. The Cosden Oil Company afterwards changed its name to the Mid-Continent Petroleum Corporation, the plaintiff in the case.

This action involves drip gasoline manufactured or distilled from natural gas from a dry gas well by the Blackwell Oil & Gas Company, the defendant. The assignment contained the following provision:

"The gas company agrees to pay from time to time to royalty owners all payments due as royalty on account of the gas produced from said lease; and further agrees to commence taking gas from said lease within ninety (90) days after the completion of the first well by the gas company upon the said leased tract. The gas company further agrees to set a meter upon said leased property through which all gas taken shall be measured, and to pay to the oil company at the rate of seven (7) cents per thousand cubic feet for one-eighth (⅛) of the volume of gas taken by it from said leased premises, under this assignment, the said seven cents per thousand cubic feet being the market price now paid by the Oklahoma Natural Gas Company for gas purchased from the field in which this tract is located. It is further understood and agreed by and between the parties hereto that should the market price paid by the Oklahoma National Gas Company for gas in this field be increased or decreased from the present rate of seven cents per thousand cubic feet, then the amount to be paid by the gas company to the oil company for one-eighth of the volume of gas so taken shall be increased or decreased accordingly.

"The gas company agrees to make a statement to the oil company not later than the 10th of each month, showing the amount of gas taken from said leased premises during the previous month, and to make payment therefor to the oil company according to the provisions of this contract not later than the 20th of the month succeeding that in which the gas is taken."

The gasoline involved in this action was manufactured through drips in the passing of the gas between the mouth of the well No. 2 located on the leased premises, and the only question involved is whether this gasoline belonged to the defendant. The trial court made certain findings of fact, among which were the following:

"The defendant contends, and the plaintiff admits in his brief, and the court, therefore, finds, and does find from the evidence, that when this gasoline comes from the well it is a part of the volume of gas coming from the well, that is, that the whole production as it comes from the mouth of the well is in the form of gas.

"The defendant has paid the land-owners the $300 per annum provided in the lease, and the contract as the royalty on this well in question, and has complied with all other provisions of the contract unless it can be said that it has wrongfully taken the drip gasoline in question."

One of the trial court's conclusions of law, upon which its judgment was based, is as follows:

"That the contract in question in this case does not constitute a barter and sale of the gas, at the meter, so as to exclude from the transfer some part of the gas that cannot or should not pass through the meter. But, on the other hand, the court concludes that the contract in question was an assignment and conveyance to the defendant of all the gas rights, in, under and pertaining to the leased property, at the time of the execution of the contract on November 29, 1920."

The Cosden Oil Company, in its assignment, assigned "all of its gas rights" to the Blackwell Oil & Gas Company, and the only question presented here is whether the drip gasoline extracted from the natural gas is embraced within the term "gas rights." The assignment of the Cosden Oil Company to the Blackwell Oil & Gas Company transferred to the Blackwell Oil & Gas Company all the rights which the Cosden Oil Company had under the lease to mine gas. It is plain from the assignment which included an operating agreement that it was the intention of the parties that the Blackwell Oil & Gas Company was to have "all gas rights," and that it has on its part performed all the obligations assumed by it in the contract. Looking at the contract as a whole, we conclude that as between the plaintiff and defendant drip gasoline, which was extracted from gas coming from a gas well, belonged to the defendant.

The gas rights under the lease and the assignment belong to the defendant. The oil rights belong to the plaintiff. As between the Mid-Continent Petroleum Corporation and the defendant, the defendant must prevail unless the drip gasoline is embraced within the oil rights granted in the lease. Casinghead gas is gas coming over the casinghead out of an oil well.

In the case of Mullendore v. Minnehoma Oil Co., 114 Okla. 251, 246 P. 837, this court held that, in a lease executed on May 27, 1907, where casinghead gas was not mentioned, the casinghead gas was not conveyed by the terms of the lease as "oil" or "gas," and held that the casinghead gas coming out of the oil well belonged to the fee owner. In that case the court said:

"As set out above, the fee owner reserved to himself by that contract one-eighth of the

oil. By this we think that both parties thereto understood that the fee owner was to receive one-eighth of the oil in the common acceptation of that term, as the same was taken from the oil well, through the pipe lines (or its equivalent in money). The other reservation to the fee owner was a sum of money for gas taken from gas wells and used off the premises. The substance in litigation here was not conveyed by the terms of the lease, either as 'oil' or 'gas taken from a gas well.' This volatile substance was, as we think, the property of the fee owner, and a conversion and sale thereof by the lessee or his assignee gave rise to a cause of action as for conversion as of the time and the place the same was sold."

If casinghead gasoline, a by-product of casinghead gas, which as it comes out of an oil well is not oil as contemplated in a lease granting oil rights, certainly drip gasoline, which is a by-product of gas coming out of a gas well, would not be oil as contemplated in an oil and gas mining lease.

In the case of Hammett Oil Co. v. Gypsy Oil Co., 95 Okla. 235, 218 P. 501, the owners of certain lands had executed an oil and gas mining lease in October, 1906. Said lease was transferred to Hammett, who executed a sublease, which provided that there should be paid to Hammett 40 per cent. of all oil produced from said lands as royalty. A certain part of Hammett's interests was transferred to Hammett Oil Company. The Gypsy Oil Company, in 1913, entered into a contract with the lessors, the owners of the fee, regarding the manufacture of gasoline from casinghead gas, and thereafter did manufacture gasoline from casinghead gas. The Hammett Oil Company brought suit against the Gypsy Oil Company for an accounting on this gasoline so manufactured from casinghead gas. In that case the subject-matter of the litigation was the gasoline manufactured from casinghead gas coming out of an oil well. In the instant case the subject-matter of the litigation is gasoline manufactured from gas coming out of a gas well. In the Hammett case, the Gypsy Oil Company installed at the oil well vacuum pumps to increase the flow of the casinghead gas. The sublease, under which the Hammett Oil Company claimed the casinghead gas, made no mention of casinghead gas, nor did the original lease make mention of it. In that case the court held that the right to manufacture gasoline from casinghead gas did not pass under the terms of either the original lease or the sublease. The court said:

"We therefore conclude that the word 'oil' and the right to produce oil did not include the right to manufacture gasoline

from casinghead gas, within the contemplation of the parties to the original lease, and the lease did not extend to the use of the premises for this purpose. Nor was there a meeting of the minds of the parties to the original lease regarding this subject. The finding of the trial court in this respect is not clearly against the weight of the evidence. The plaintiff having based his action upon a contract, which did not extend to the subject which was in controversy, his action must fail."

The court, however, did say:

"We do not intend to say that, if the placing of the vacuum pumps upon the wells to increase the flow of casinghead gas decreased the production of oil, or reduced the gravity of the oil produced, plaintiff would not have a cause of action—whether by injunction or an action for damages, it is unnecessary for us to decide—but the action cannot be founded upon the contract for a portion of a product not embraced in the contract."

In the last mentioned case, the Gypsy Oil Company contended that the casinghead gas was gas and not oil, and that the gasoline was extracted from the gas and not from oil. The court did not expressly find that casinghead gas is gas, but did find that, in the popular sense, it was not oil, in the following language:

"In our judgment, the question is not whether gasoline manufactured from casinghead gas is oil in a technical sense, but whether it is oil in its ordinary and popular sense, and was so understood by the parties to the oil and gas lease, which granted this lessee the right to produce oil or gas, and provided for a royalty of one-eighth of the oil delivered in the pipe line."

In the case of Mussellem v. Magnolia Petroleum Co., 107 Okla. 183, 231 P. 526, supra, the Mussellems, the owners of certain lands, leased them on February 3, 1913, for oil and gas, and the defendant Magnolia Petroleum Company owned the lease. Casinghead gas was not mentioned in the lease, and the defendant took the casinghead gas coming from oil wells on the lease and had manufactured from it casinghead gasoline. With reference to gas coming from an oil well, the lease contained the following covenant:

"Third. To pay the parties of the first part for gas produced from an oil well, and used off the premises, at the rate of $50 per year, for the time during which such gas shall be so used, said payments to be made each three months in advance."

It was held in that case that the casinghead gas did not pass to the lessee under this provision of the lease, but was the property of the landowner, and that gas coming from an oil well and known as

casinghead gas was gas as referred to in said third subdivision of said oil and gas lease. It was held that the casinghead gas passed to the lessees under the above provisions of the contract which granted the gas. In that case, the court said:

"The trial court made no holding with reference to gasoline manufactured either from gas, wet or dry, or from petroleum itself. Such question was not there, and is not here. But, as to the interpretation of the third clause of the contract, in the light of the evidence in the record, the scientific definitions and discussions above set out, we fail to find any fault in the holding of the trial court that the lease contract passed the title to that substance which was generally known to come from an oil well and familiarly designated as gas, and the holding was not erroneous in the light of the common acceptation of the terms used, as well as scientific knowledge on the subject."

If gasoline manufactured from casinghead gas coming out of an oil well passes to a lessee under a covenant conveying gas, then it is reasonable to assume that gasoline manufactured from gas coming from a gas well would pass by an assignment conveying the "gas rights," and said Mussellem Case is authority supporting a judgment in favor of the Blackwell Oil & Gas Company in the case at bar. If casinghead gas coming out of an oil well is "gas," as mentioned in the Mussellem Case, then certainly gas coming out of a gas well from which drip gasoline is extracted is gas as is mentioned in the lease in the instant case.

In the case of Phillips v. Henderson Co., 101 Okla. 277, 225 P. 668, Charles Harter and A. J. Thompson owned an oil and gas mining lease on certain lands in Nowata county. They entered into a contract with Henderson Company to sell that company "all of the casinghead gas produced from oil wells located on the "premises" in question. The contract further provided that the gas should be delivered into the lines of the defendant "at the gas pumps which have been or will be installed by the said parties of the first part," and that the amount of gas to be delivered was to "be determined by connecting a meter of standard make. etc., on the intake line of the Henderson Company." The owners of the lease thereafter sold their lease to W. H. Phillips et al. Phillips et al. installed certain scrubbers and drips on their gas line between the wells and the intake line of the Henderson Company, and extracted or took from the gas a large amount of condensate or drip gasoline and appropriated it to their own use. On two of the tracts, however, this drip gasoline was collected and sold by the Henderson Company. The question involved in the case was as to who owned this condensate or drip gasoline which did not go through the meter. The court held that the machinery installed on certain of the leases was unnecessary in that it extracted an unnecessary amount of gasoline from the casinghead gas, and that this amount of gasoline unnecessarily extracted from the casinghead gas should be accounted for to the owners of the lease, but that all the balance of the drip gasoline belonged to the Henderson Company. The court in construing the lease held that:

"It is clear plaintiffs were selling what passed through the meter, and the defendant was buying and paying for what passed through the meter. * * *

"There is nothing in the contract to even infer that the parties intended to purchase casinghead gasoline in liquid form, but, to the contrary, they were purchasing what was delivered through the meter in vaporous form. * * *

"The defendant is entitled to have the gas pass from the well to the meter without unnecessary drips, or unnecessary scrubber tanks, that have a tendency to lessen the value of the casinghead gas."

In other words, the court held that the Henderson Company bought all the casinghead gas which could pass through the meter, and nothing more, and that it was entitled to have all the casinghead gas pass through the meter, but that the plaintiff was entitled to the drip gasoline which it became necessary to extract in order that the meter would properly register the casinghead gas, and that on the lease where an excess of drip gasoline was collected by reason of installing unnecessary machinery by the plaintiff, the plaintiff should account to the defendant therefor.

In the Henderson Case, supra, from a consideration of the contract as a whole, the court found that the Henderson Company had purchased the casinghead gas which could be metered and no more, and that the owners of the lease were entitled to extract from the gas such by-products as was necessary in order to make it possible to correctly meter the casinghead gas and no more. In the Henderson Case, supra, the Henderson Company did not own any interest in the oil and gas mining lease, or any part of the mineral rights, except the casinghead gas which went through the meter. In the instant case the Cosden Oil Company had conveyed to the Blackwell Oil & Gas Company all the gas rights covered by the oil and gas mining lease, which included the easement to go upon the premises and mine and market the gas including all by-products of the gas, but reserved the oil

## 46

rights. From an examination of the entire contract it is apparent that the Blackwell Gas Company was to pay as part consideration for such gas rights, the royalty mentioned in the contract of seven cents per thousand cubic feet for one-eighth of the volume of gas as metered. Although casinghead gas partakes to some extent of the nature of oil, yet, when it comes out of the well, it is gas, and the mining of which from a gas well is a part of "gas rights" mentioned in the contract. One of the findings of the trial court which is supported by the evidence is as follows:

"The court does find that it is the general practice and proper practice, as set forth in finding of fact No. 7, to maintain a drip, and that the parties to this contract contemplated the use of a drip at this well if it produced gas, and fixed the considerations in the contract with that factor in view."

In the case of Wilson v. King-Smith Ref. Co., 119 Okla. 256, 250 P. 90, this court, in the first paragraph of the syllabus, said:

"In an action for the recovery of royalties on products made from casinghead gas, where the lease sued upon contains a specific provision for royalties on oil products from oil wells, and where the lease provides that if gas is found in any well or wells on the premises the lessor is to have sufficient gas for domestic purposes free of charge, the remainder with all the gas from oil wells to go to the lessee, such latter provision is sufficiently broad to cover all rights which the lessor may have in the casinghead gas coming from oil wells. Following Mussellem v. Magnolia Pet. Co., 107 Okla. 183, 231 P. 526, and Pautler v. Franchot, 108 Okla. 130, 235 P. 209."

In the body of the opinion, the court said:

"Whether the parties at the time of the execution of this lease contract in 1912 did or did not anticipate, the production of casinghead gas is, we think, immaterial, in view of the decisions of this court that gas from an oil well constitutes casinghead gas. Mussellem v. Magnolia Pet. Co., 107 Okla. 183, 231 P. 526; Pautler v. Franchot, 108 Okla. 130, 235 P. 209.

"In the Mussellem Case, supra, the court said:

"'From the above citations of the evidence, the definitions of such gas as here in question, from the departmental regulations and scientific treatises on the subject, "casinghead gas" is nothing other than gas from an oil well, and to concur in the contention made by plaintiffs would be tantamount to writing a modification into the third clause of the contract.'

"The lease in the Mussellem Case contained three clauses wherein the question of royalty was involved. The first referred to the royalty due the lessor in the event of the discovery and production of oil. The second referred to the royalty due the lessor in the event of the discovery and production of gas. The third was as follows:

"'Third, to pay the parties of the first part for gas produced from an oil well, and used off the premises, at the rate of $50 per year, for the time,' etc.

"The third clause in the Mussellem Case is identical with that in the instant case, except that in the Mussellem Case the lessee contracted to pay the lessor $50 per year for gas from each oil well—that is to say, casinghead gas—whereas, in the instant case, the parties provided that 'all gas from an oil well' should pass to the lessee.

"In the Pautler Case, supra, the plaintiff in error sought reversal of the lower court on a judgment on the pleadings. In the Pautler Case, the third cause, analogous to the 'third obligation' in the Mussellem Case and the third clause in the instant case, was as follows:

"'Third. To pay lessor for gas produced from any oil well and used off the premises' at the rate of one-eighth revenue at 3¢ per M for the time during which such gas shall be used. * * *'

"In the above case this court held that the identical questions raised were presented and determined by the court in the Mussellem Case; that the lease provisions in both cases were the same in legal effect.

"It may be observed that the only difference between the Mussellem and Pautler Cases, on the one hand, and the instant case on the other, is that the latter provides that the gas from an oil well, i. e., casinghead gas, goes to the lessee.

"Plaintiffs rely particularly upon two decisions of this court for the purpose of effecting a reversal of the judgment of the trial court, to wit: Hammett Oil Co. v. Gypsy Oil Co., 95 Okla. 235, 218 P. 501; George v. Curtain, 108 Okla. 281, 236 P. 876.

"In the Hammett Case, supra, the court, after citing authorities, said:

"'We think these cases support the position that gasoline manufactured from casinghead gas is neither oil nor gas within the contemplation of an oil and gas lease, which makes no reference to casinghead gas, and nothing appears to indicate that the parties have contracted concerning the same.'

"The proposition simply means that where an oil and gas lease provides merely for a gas royalty and an oil royalty, and since casinghead gas is not gas simply, nor oil simply, in such case there is nothing which refers 'to casinghead gas, and nothing appears to indicate that the parties have contracted concerning the same,' and therefore no contract made which covers such product, since casinghead gas is gas from

an oil well. If we had before us an oil and gas lease which provided merely a gas royalty and an oil royalty, instead of a lease which purports to fix the rights of the contracting parties to 'gas from an oil well,' which, under the contract, was given to the lessee, a different question would arise.

"In the George v. Curtain Case, supra, cited by plaintiffs, the court held, in effect, that when an oil and gas contract provides merely for royalty on gas, and royalty on oil, the contract cannot be extended to cover that which by their silence the parties have indicated they did not have in contemplation, namely, gas from an oil well, or casinghead gas.

"The case of Phillips v. Henderson Gasoline Co., 101 Okla. 277-279, 225 P. 668, cited by counsel for plaintiffs, lends no support to the contention made. The court said that:

" '* * * If the parties made no contract regarding the waste product, then, by construing the contract in accordance with section 5051, Comp. Stat. 1921, the contract would not extend to this subject-matter.'

"But the lease in the instant case contains a clause which specifically fixes the rights of the parties to gas from an oil well—that is to say, casinghead gas."

The only purpose of the meter was to register the volume of gas, in order that the oil company might be paid as a part of its consideration for the assignment, the sum of seven cents per thousand for one-eighth of the volume of gas passing through the meter. It is not disputed that the gas company metered the gas in the usual and proper manner. In this connection it is to be remembered that the Cosden Oil & Gas Company stood in the shoes of the original lessee, and by the instrument in question it assigned and conveyed all of its gas rights to the defendant company and had no interest therein except to receive its consideration for this assignment. The operating agreement in no manner subtracted from or lessened the estate created by the assignment. After the assignment the Blackwell Oil & Gas Company then became the owner of the gas rights therein assigned, and as a producer under its gas rights, which it had received and paid for under its assignment from the Cosden Oil & Gas Company, it was entitled to and did save the gas produced in its natural form as it came from the mouth of the well, or any of its constituent elements, including gasoline.

The only interest the Cosden Oil Company could have in the gas rights was to receive its consideration, and for failure to receive that consideration it would be entitled to damages for a breach of contract.

In the case of Lone Star Gas Co. v. Stine,

41 S. W. (2d) 48, the court of Commission of Appeals of Texas quotes with approval the case of Wilson v. King-Smith Ref. Co., 119 Okla. 256, 250 P. 90, and held that a deed conveying all natural gas included all substances that came from the well as gas, whether gas was wet or dry, and that the purchaser could take gasoline from the gas without becoming liable for royalties on gasoline to the grantor under operating agreement, which was executed contemporaneously with the deeds conveying all rights, title, interest, ownership, and claim in all natural gas and reserving oil rights, and which provided that in case purchaser of gas elected to save oil from well productive of both oil and gas, he could do so on payment of one-eighth value thereof to owners. It appears that J. H. Stine et al. were the owners of certain land in Clay county, Tex., aggregating 750 acres, and on November 23, 1911, and December 5, 1911, for a cash consideration of $24,738, executed and delivered to the Lone Star Gas Company certain gas deeds conveying to the gas company "all our rights, title and interest, ownership and claim, both present and prospective, in all natural gas in and under the following tract and parcels of land. * * *" These instruments were duly acknowledged, delivered, and recorded, and at the same time said gas deeds were executed and delivered, the parties entered into an operating agreement, and gasoline was thereafter absorbed or extracted from the gas coming from the gas wells. J. H. Stine et al. instituted suit against the gas company for an accounting and for a one-eighth royalty on all the gasoline which had been produced by the gas company.

As to the method used in obtaining the gasoline, the court, in its opinion, says:

"Prior to 1916, this gas was conveyed by the gas company to a compressor near the wells where it was compressed in order to increase the pressure in the mains, and thus facilitate its transportation through the pipe line. The gas was run from the compressor into the pipe line, which conveyed it to where it was sold for fuel purposes. During this time, when the weather was cold, and because of such low temperature and high pressure, gasoline which was a part of the gas, and was in gaseous form when it came from the wells, would sometimes accumulate in the drips along the line in such quantities that it could be taken and used as motor fuel.

"We here quote and adopt the following facts found by the Court of Civil Appeals: 'In the year 1916 the appellee built its absorption plant, and after the completion of that plant the gas from the appellants' land was conveyed from the wells to the compressor station, and from the compres-

sor station to the absorption plant, where it was run through a kind of crude oil. This crude oil absorbed from the gas the gasoline which was carried along with the gas in the form of vapor, and the dry gas, after the gasoline had thus been absorbed from it, went into the main lines of appellee, and was transported to various cities for fuel purposes. One of appellee's witnesses described the process of extracting the gasoline as being a method by which gas was run through a certain kind of oil so that the oil became saturated with the hydrocarbons that go to make gasoline. The testimony is that this gasoline vapor may be converted into gasoline either by the absorption method used by the appellee, or by compression and cooling. That is, that by compression and lowering of temperature, the gas or vapor will be changed from its vaporous form into liquid, and this is the method which is ordinarily used in changing casinghead gas into gasoline.'

"This suit was instituted in the district court of Clay county, Tex., by Stine et al. against the gas company for an accounting and for a one-eighth royalty on all gasoline that was produced by the process shown above.

"The case was tried in the district court with a jury, but at the close of the testimony the trial judge directed a verdict for the gas company. The verdict was returned as directed, and judgment rendered accordingly. On appeal by Stine et al., the Court of Civil Appeals reversed the judgment of the district court and rendered judgment for Stine et al., 23 S. W. (2d) 752. The case is in the Supreme Court on writ of error granted on application of the gas company.

"As we understand the opinion of the Court of Civil Appeals, it holds that as a matter of law the gasoline manufactured from the natural gas which flowed from the gas company's wells was oil within the meaning of the deeds and 'operating agreement,' supra. We think this holding is error. Humble Oil & Refining Co. v. Poe (Tex. Com. App.) 29 S. W. (2d) 1019, 1020: Magnolia Petroleum Co. v. Connellee (Tex. Com. App.) 11 S. W. (2d) 158.

"A careful reading of the gas deeds and 'operating agreement' clearly discloses that the 'operating agreement' does not and was not intended to in any way subtract from the estate conveyed by the gas deeds, but was intended merely to provide a method by which the owner of the gas estate and the owners of the oil estate could work together and protect the interests of each. We must therefore determine what was conveyed by the gas deeds.

"At this point, we deem it expedient to quote the following from Judge Leddy's opinion in Humble Oil & Refining Co. v. Poe. supra.

" 'It is difficult to conceive upon what theory defendant in error was entitled to recover for gasoline which could have been manufactured from gas produced from a gas well, in the face of the provision in the lease that "lessee agrees to pay the lessor at the rate of $250 each year, payable quarterly in advance for the gas from each well where gas only is found, while the same is being used off the premises." * * *

" 'Plaintiff in error acquired the right to use the gas produced from a gas well it might drill on the premises covered by a lease by the payment of the agreed rental of $250 per annum. Having bought and paid for such gas, it owned the same, including all of its constituent elements, and therefore had the lawful right to make such use of it as it might deem proper. Wilson v. King Smith Refining Co., 119 Okla. 256, 250 P. 90; Shaw v. Fender, 138 Ga. 48, 74 S. E. 792; McRae v. Smith, 164 Ga. 23, 137 S. E. 390; Magnolia Petroleum Co. v. Connellee, supra.'

"The real questions presented in the Poe Case, supra, and the questions here pesented, are in law the same. In the Poe Case, the oil company had a lease, while in the instant case the gas company has a deed to 'all natural gas.' In the instant case, the gas company has the right, under its deeds, to 'drill for and develop gas and take the same free from any charges or royalty.' The gas company paid a large consideration running to thousands of dollars for 'all natural gas' in and under these lands An examination of the several instruments clearly discloses that the gas conveyed was not limited to any particular kind or character of gas, but the conveyance is all-embracing as regards gas, and covers and includes 'all natural gas.' The term 'all natural gas' would include all the substances that come from the well as gas, and that regardless of whether such gas be wet or dry. It is un disputed in the evidence that the term 'natural gas' includes numerous elements or component parts, but the very language of the conveyance is such as to include therein all these component parts which were in gaseous form when they came from the wells.

"It is a fact disclosed by this record that gas and gasoline can be manufactured from coal. Could it be successfully contended that if the owner of land should convey all the coal in, on, and under such land, and reserve all oil and gas, that he could claim as gas and oil the gas and gasoline manufactured from the coal? We think not; yet such claim would be as just and as logical as the one here advanced by Stine et al. Furthermore, suppose Stine et al. had taken their oil and manufactured gas therefrom. Could the gas company have claimed the same under their gas deed? We think to state such a question is to demonstrate the fallacy of the contention here made by Stine et al. In other words, if it is permissible under these gas deeds and 'operating agree-

ment' for Stine et al. to take from the gas company the oil element which formed a constituent gaseous part of the gas as it came from the well, it would be equally as permissible for the gas company to take from Stine et al. the various gaseous elements which form component parts of oil.

"The evidence in this case conclusively shows that the gasoline in controversy here was manufactured from gas which came from the wells as gas. This gasoline was separated from the gas and became liquid only when it was subjected to the manufacturing process shown above. It is true that the gasoline element was in the gas when it came from the well, but it was then in gaseous form, that is, it was an element or component part of the natural gas, and gas or natural gas was the thing conveyed by the deeds. The legal effect of the deed was to convey 'all natural gas,' and by the term 'natural. gas', it meant all the constituent elements composing the same. The gas company, having become the owner of 'all natural gas' in or under this land, has the right to make such use thereof as it sees fit. It may sell the gas in its natural form as it came from the earth, or it may split it into its constituent elements and sell such elements, including the gasoline. * * *

"In the instant case, the grant to the gas estate is general and all embracing, and nowhere in the gas deed or in the 'operating agreement' is there any language used that can be construed as making any exceptions to the general grant of 'all natural gas' contained in the gas deeds. Stine et al. conveyed to the gas company 'all natural gas in and under' this land, and further they expressly granted to the gas company the right. 'at all times to enter upon the land, drill for and develop gas and take the same free from charges and royalty,' and they should abide such contract as they made it.

"We recommend that the judgment of the Court of Civil Appeals be reversed, and the judgment of the district court affirmed."

The opinion in the Stine et al. Case was rendered on the 22nd day of July, 1931, subsequent to the time Mr. Justice Riley wrote an opinion in the instant case, and presents a clear announcement of law applicable to the instant case. See, also, the case of Lone Star Gas Co. v. Harris, rendered November 27, 1931, rehearing denied January 15, 1932, 45 S. W. (2d) 664, wherein the court of Civil Appeals of Texas follows the Stine et al. Case, supra.

The assignment is a contract. It is an agreement whereby all of the gas rights which the Mid-Continent Company ever acquired were assigned to the Blackwell Oil & Gas Company. Instead of the gas company in the instant case paying a lump sum to the oil company, for the assignment, as was done in the Stine et al. Case, supra,

the consideration was to be paid for the gas taken and measured by a meter in the usual and proper way, at the rate of seven cents per thousand cubic feet for one-eighth of the volume of gas taken from the premises, under the assignment. The oil company, in the instant case, never saw fit to exercise its option by taking over this gas well for the purpose of treating the same as an oil well, and the oil company in their brief contend:

"Where gas from a gas well is metered, it is proper, usual, and practically universal custom to install a 'drip' between the mouth of the well and the meter to eliminate all fluid, such as water and gasoline, carried along with the gas before same reaches the meter, one of the important purposes being to obtain accurate meter readings."

The constituent gasoline coming from gas or oil, at the time of the assignment. was well known to the oil industry. It cannot be questioned that the terms of the instrument in question clearly and positively state that the oil company hereby assigns and conveys unto the gas company all of its gas rights. The instrument also recites: "In consideration of the foregoing assignment. * * *"Again, "The gas company agrees to pay * * * further agrees to set a meter * * * and to pay * * * under this assignment. * * *" Also, in the fourth paragraph of the assignment is the expression: "tract hereby assigned." It is an evasion of the question to say that the oil company did not assign by this instrument all the gas rights which it has acquired under the lease contract.

The majority opinion ignores the plain provision of the contract, which is nothing but a plain assignment of the gas rights in the instant case, with certain other provisions, and states, in substance, that the court should construe the contract as written and not read anything into the same, and then proceed to write a contract for the parties by inserting a provision to the effect that the gas company shall surrender to the oil company a constituent element of the gas which it mined by reason of its assignment and conveyance, and thereby strikes from the contract the clause which assigns and conveys the gas rights to the gas company.

After a careful review of the questions involved herein, it is my judgment that the opinion of Mr. Justice Riley, rendered on the 7th day of July, 1931, and concurred in at the time by a majority of the members of this court, which affirmed the judgment of the trial court, should stand.

---

On Rehearing.

SWINDALL, J. (dissenting). There

have been three opinions written in this case by members of the court. The first opinion was by Mr. Justice Hefner, delivered March 3, 1931, in which a majority of the court concurred, and in that opinion the court announced the rule of law applicable to the facts in the case as follows:

"The oil company assigned the gas right of an oil and gas lease to the gas company and the gas company agreed to set a meter upon the lease through which all gas taken should be measured and agreed to pay the oil company at the rate of seven cents per thousand cubic feet for ⅛ of the volume of gas taken by it from the leased premises under the assignment. The meter was installed by the gas company about 125 feet from the well and a 'drip' to catch drip gasoline was installed between the meter and the well. Held, that the oil company was entitled to the drip gasoline that was taken from the gas between the mouth of the well and the meter and that the gas company was entitled to all that was taken from the gas after it passed through the meter."

Later a rehearing was granted, and the opinion withdrawn, and on July 7, 1931, Mr. Justice Riley delivered the opinion of the court, to which four members dissented, and the writer of this opinion wrote a dissenting opinion in that case. A petition for rehearing was filed and upon consideration thereof a second rehearing was granted and Mr. Justice Andrews wrote the opinion of the court delivered April 12, 1932. There were some statements in the opinion delivered by Mr. Justice Andrews with which I did not agree. While the question passed upon is not the issue involved, as shown by the pleadings, I felt at the time that it did not materially divert from the position taken by the court in former decisions relative to oil and gas leases of the class stated in the opinion. A petition for rehearing has been filed in the case, in which it is pointed out that the opinion delivered by Mr. Justice Andrews conflicts with certain former decisions of this court. After a more careful consideration of the facts in the case, I am of the opinion the decision is not in harmony with the former holdings of this court.

In this case the class of oil and gas lease is not really involved. It was the contention of the plaintiff in error, plaintiff in the trial court, that the defendant in error, defendant in the trial court, contracted only for the gas that was measured through the meter. Under the issues joined by the pleadings, I am of the opinion this was the only question presented to the trial court. The contract provides that:

"The gas company further agrees to set a meter upon said leased property through which all gas taken shall be measured, and to pay to the oil company at the rate of seven (7) cents per thousand cubic feet for one-eighth (⅛) of the volume of gas taken by it from said leased premises, under this assignment, the said seven cents per thousand cubic feet being the market price now paid by the Oklahoma Natural Gas Company for gas purchased from the field in which this tract is located."

If the petroleum product involved in this case was gas that could have been metered, it was the duty of the gas company under the contract to measure the same through the meter and pay to the oil company the contract price agreed upon. If it was gas so highly impregnated with oil as to constitute casinghead gas or drip gasoline and could not be measured through the meter, then it was not the kind of gas that the gas company agreed to purchase from the oil company and clearly the gas company had no right to reduce such product to its possession and convert it to its own use as casinghead gas or drip gasoline prior to the time that it was measured through the meter. The majority opinion states that:

"Under date of August 4, 1916, the owners of certain real estate granted, demised, leased, and let the same to the Marland Oil Company for the sole and only purpose of mining and operating for oil and gas, and laying pipe lines, and building tanks, power stations, and structures thereon, to produce, save, and take care of said products for a term of five years and as long thereafter as oil or gas or either of them is produced from said land by the lessee."

In other words, the majority opinion passes upon the class of lease executed and under the holding in the majority opinion the lease is what is referred to in the former decisions of this court as a two-class lease, that is, a lease which covers oil and gas wells only and does not cover and include wells that produce both oil and gas. Hammett Oil Co. v. Gypsy Oil Co., 95 Okla. 235, 218 P. 501; Smith v. Pulaski Oil Co., 88 Okla. 47, 211 P. 1047; Mullendore v. Minnehoma Oil Co., 114 Okla. 251, 246 P. 837; George v. Curtain, 108 Okla. 281, 236 P. 876; Phillips v. Henderson Co., 101 Okla. 277, 225 P. 668. If the owners of the land and Marland Oil Company did not by the terms of their lease cover and include wells producing both oil and gas, the Marland Oil Company could only assign to the Cosden Oil Company the lease it held on the Martin land, and the Mid-Continent Petroleum Corporation only

acquired the rights to the gas and oil under the lease between the Martins and Marland Oil Company and did not acquire the casing-head gas or drip gasoline. So, when this court reverses and remands the cause to the trial court with directions to render judgment in favor of the Mid-Continent Petroleum Corporation for the drip gasoline, in my opinion it is going beyond the agreement involved in this action. The issue relating to the three-class lease, that is, a lease upon which wells are drilled producing both oil and gas, is an issue to be determined between the landowner and the Mid-Continent Petroleum Corporation, and is not involved in this action, and the landowner not being a party to the suit, his rights cannot be adjudicated in this appeal. I am of the opinion that the decision of this court delivered by Mr. Justice Andrews does not pass upon the issues joined under the pleadings and announce a correct rule of law as applied to the facts in this case. I, therefore, most respectfully dissent.

Note.—See under (1) 6 R. C. L. 858; R. C. L. Perm. Supp. p. 1844.