## PITTSBURG & MIDWAY COAL MINING CO. et al. v. PHAROAH.

No. 26432.    Sept. 8, 1936.

C. J. Pinkston and W. E. Foster, for plaintiffs in error.

G. L. Bynum and C. A. Ambrister, for defendant in error.

BAYLESS, J.    The defendant in error, O. J. Pharoah, sued the plaintiff in error, Pittsburg & Midway Coal Mining Company, a corporation, and others, defendants, in the superior court of Okmulgee county, Okla. The parties will be referred to as plaintiff and defendant, except where necessary to call names.

The history of the matter is as follows: Plaintiff's remote grantor made a lease contract in 1917 to a coal mining company covering certain lands. This company commenced operations and carried on until 1920, when it assigned the contract to defendant. In May, 1923, plaintiff became the owner of enough of the leased lands to entitle him to one-half of the royalties. The defendant did not operate the mine after plaintiff bought his interest beyond one royalty payment for coal produced. Plaintiff brought this suit to recover certain unpaid advance royalties asserted to be delinquent. The whole controversy revolves around a construction of the portion of the contract requiring the payment of advance royalties and the amount thereof.

The trial court found that the contract was a valid and subsisting one, and found that the advance royalty payment of $240 was to be made monthly, and that there was delinquency therein to plaintiff's part of $14,760.30. Judgment was rendered accordingly.

Defendant makes its argument under four propositions. Under I and II defendant says there was no merchantable coal and no liability to pay any royalty arose, and if there was no merchantable coal, it had a right to abandon the venture and terminate its liability for advance royalties. The evidence is such that it is necessary to discuss these two together.

The pertinent portions of the contract read:

"Party of the second part further agrees and covenants to exercise diligence in the conduct of the prospecting and mining operations to open a mine or mines and to operate the same in a workmanlike manner and to the fullest possible extent to remove the coal from said premises and that it will mine at least 3,000 tons daily bulletin weights per calendar year, or to pay first party the sum of $240.00 as advance royalties, which sum shall not bear interest and may be deducted from the royalties accruing in any subsequent year after 3,000 tons have been paid on.

"The second party agrees to mine as much coal from this lease as from any other lease until all commercial coal is removed from said land above described and will hold the lessor blameless of any subsidence or condition that may arise from its mining operations."

The agreed royalty was 8c per ton.

The plaintiff contended that there was

workable coal on the leasehold and the same was salable. The defendant admitted there was workable coal, but contended that such coal was not merchantable due to the presence therein of nonflammable or deleterious substances. The defendant contended further that, since the workable coal was not salable, it could abandon operations and be relieved of the payment of advance royalty payments.

The defendant proved that the coal was not merchantable after 1923, by which we are given to understand that it could not be sold in ordinary times in competition with better coal. But it is equally clear that defendant did not terminate its lease contract. It only abandoned present operations, and terminated the advance royalty payments.

As we construe this contract, it could terminate the lease contract upon giving 60 days' notice in writing. But, since it did not do this, but on the contrary refrained from giving such notice and when there was danger of the property being sold for taxes sought action on the part of plaintiff to save the same, therefore, the defendant's conduct was properly construed to mean that it did not consider the lease contract terminated. Defendant's conduct was consistent with this attitude: There is no merchantable (salable) coal there due to conditions of the coal market over which we have no control, but there is a possibility that in a changed market condition we could again sell the workable coal: therefore, we will abandon operations until such change occurs, but we will not terminate the contract. Defendant did not cancel the contract by notice, as provided by its terms, nor did it terminate it by an intentional abandonment. The defendant was obligated by the terms of the contract to pay the minimum royalty so long as the contract continued in existence.

Proposition III reads:

"If the finding of the trial court that merchantable coal existed in the land in question can be sustained in this court upon any theory of the law or the evidence its judgment would still be erroneous and should be set aside as excessive and the cause remanded with directions to the trial court to enter judgment covering advance royalties computed on the basis of $120 per year for eight years one and one-half months."

Since we have held that defendant's interpretation of the contract was to the effect that the contract was yet in existence, there remained the duty to pay the advance royalty, or minimum payments, and we must now determine when and for what period these were payable.

The answer to this proposition is found in the interpretation and construction of this part of the contract:

"* * * That it will mine at least 3,000 tons daily bulletin weights per calendar year, or to pay first party the sum of $240 as advance royalties, which sum shall not bear interest and may be deducted from royalties accruing in any subsequent year after 3,000 tons have been paid on."

The plaintiff pleaded that defendant was obligated to pay $240 per day, whereas defendant contends that if there is any obligation, it is to pay $240 per annum. The trial court deemed the contract ambiguous in this respect, and from evidence that 3,000 tons per month was a reasonable quantity to produce from this mine, found the obligation to be to pay monthly.

The portion of the contract reading as follows: "That it will mine at least 3,000 tons daily bulletin weights per calendar year, or pay to the first party the sum of $240 as advance royalties," is slightly ambiguous in the face of the contentions of the parties. But the court is not restricted to that portion alone for its meaning.

The rule for construing contracts is that the meaning, the intention of the parties, the obligations assumed, must be deduced from the entire contract, and not from some portion standing alone. Each phrase, sentence, and paragraph of a contract must be construed, not alone of itself, but as it affects and is affected by the remainder of the contract. Mid-Continent Pet. Corp. v. Blackwell Oil & Gas Co., 159 Okla. 35, 15 P. (2d) 1028, and many other cases. If the ambiguity remains when the whole contract is considered, then, and only then, resort may be had to extrinsic matters to clarify the matter. Standard Acc. Ins. Co. v. Goldberg, 120 Okla. 108, 250 P. 892.

In view of these rules we are of the opinion that the last-quoted portion is not ambiguous in the light of the entire phrase in which it is found. The phrase "daily bulletin weights per calendar year" is ambiguous. If the word "daily" be given the effect claimed, "per calendar year" is contradictory and superfluous. The words following refer to the repayment of one sum, $240, in any subsequent year after 3,000 tons have been paid for. This is a flat contradiction to the 3,000 tons daily idea. The plaintiff made no attempt to introduce evidence ex-

traneous to the wording of the contract to show what the agreement of the parties was, nor did he attempt to show by the custom of the business that the term referred to was daily, rather than annual. The trial court evidently was not impressed with the daily feature of the contract, for he stated in his findings of fact and conclusion that he was basing his judgment that the period intended was monthly, instead of daily or yearly, upon the evidence of one witness and his independent knowledge of the customs of the business.

If the entire phrase is read as follows:

"* * * That it will mine at least 3,000 tons, daily bulletin weights, per calendar year, or pay to the first party the sum of $240 as advance royalties, which sum shall not bear interest and may be deducted from royalties accruing in any subsequent year after 3,000 tons have been paid on"

—there is no ambiguity, and it reasonably can be seen that the parties were trying to contract with reference to an annual period, and not a daily period, as contended by plaintiff, or a monthly period, as found by the court.

Proposition IV relates to the action of the court in overruling the motion for new trial. Nothing was raised in this motion for new trial which is not covered by what we have said already.

Therefore, the judgment of the trial court, in so far as it held the contract to be yet in existence, is affirmed; but it is reversed in so far as the calculated royalties are concerned, and the cause is remanded to enter judgment in keeping with the views herein expressed.

McNEILL, C. J., OSBORN, V. C. J., and PHELPS and CORN, JJ., concur.