ODOM, Justice.
 

 Plaintiffs own certain lands in the Rodessa gas field in the parish of Caddo on which they granted leases for the production of oil and gas. The royalty clause in the leases provides that in case oil is discovered the lessees shall deliver to the credit of the lessors, free of cost, in the pipe line to which he may connect his wells, the equal one-eighth part of, all oil produced and saved from the leased premises. As to gas, it is provided that the lessees shall pay to the lessor $200 each year for each well producing gas only, until such time as the gas shall be utilized or sold off the premises and that thereafter “the grantor shall be paid one-eighth
 
 (Vs)
 
 of the value of such gas calculated at the market price per ■ thousand feet, corrected to two pounds above atmospheric pressure.”
 

 The lessees drilled one well on the leased premises and brought in gas which is strongly impregnated with gasoline. They carried the gas through private pipe lines a distance of approximately two miles where they sold it to the Arkansas-Louisiana Pipe Line Company at 5.8 cents per thousand cubic feet. Approximately one-half gallon of gasoline per thousand cubic feet was extracted from the gas and sold at the market price.
 

 The lessees settled with the lessors for the gas at 4 cents per thousand cubic feet, and for the gasoline at the market price, less costs of extraction. The lessors became dissatisfied with the price received for the gas, it being their contention that they should be paid on the basis of the sale price thereof.
 
 *911
 
 They further contend that under their lease contract the lessees were not entitled to any of the gasoline extracted from the gas, hut that they, the lessors, should he paid for the entire quantity of the gasoline extracted.
 

 The present suit is for an accounting, the plaintiffs demanding the difference between the price which they were paid for their proportion of the gas and the price at which it was sold. The plaintiffs at the time this suit was filed owned an undivided one-half interest in the mineral rights.
 

 Plaintiffs’ contention is set forth in their brief, and, as there stated, they contend that they should receive settlement as follows:
 

 “On gas,
 
 i/le
 
 Of the value of such gas based on the market price of such gas where sold off the premises. In other words, the expression ‘market price’ in the lease means the price for which lessee marketed the gas ‘off the premises’, and not an arbitrary price of 40 per thousand cubic feet which the lessee itself fixes as the price the lessors should receive for the gas.
 

 “On
 
 Gasoline
 
 — y2 of the gasoline produced from the leased premises, or it having been taken and sold, % of the net amount received by the United Gas Public Service Company for the sale of such gasoline; or in the alternative,
 
 y1G
 
 of the gross amount actually received by the United Gas Public Service Company for the gasoline sold.”
 

 The contention of defendant is that it should settle with the plaintiffs at the market price of the gas at the well, which, it is alleged, was 4 cents per thousand cubic feet; and as to the gasoline, that it is entitled to the same proportion of it as of the gas itself, and that in settling with the lessors it was due to pay the price which it brought in the market, less the expense of extraction.
 

 The district court rejected plaintiffs’ demands as to the gasoline, but held that plaintiffs should be paid on the basis of the .price received for the gas where sold, less the expense of conveying it to the market. According to the findings of the trial judge, plaintiffs should have been paid slightly more than 4 cents per thousand cubic feet for the gas.
 

 Prom this judgment, plaintiffs appealed and the defendant moved to amend the judgment so as to reject plaintiffs’ demands in toto.
 

 The two questions involved in this suit are, first, whether the term “market price,” as used in these leases, means the current price at which natural gas is sold in the fields in the territory where it was produced, or the gross price received by the producer in the market where sold; and, second, whether under the ordinary oil and gas lease contract, such as this one, providing that the lessor shall have a one-eighth royalty interest in the gas, he is entitled to all the gasoline extracted from the gas by the lessee or only one-eighth thereof.
 

 (1) In the lease contract here involved, the lessee was required to pay to the lessor one-eighth of the value of the gas sold off the premises, calculated at the “market price” thereof. The price to be paid was left open or made to depend upon the “market price” at the time the gas was produced. The lessee settled with the lessors for the gas a't 4 cents per thousand cubic feet, which it contends was the “market price” at the well, its theory being that the market price there is the proper
 
 *913
 
 basis for the settlement. It admits that it sold the gas at a place two miles from the field at 5.8 cents per thousand cubic feet. The plaintiffs demand settlement on the basis of the sale price of the gas where sold.
 

 There is nothing in the contract itself nor in the testimony to show the intent of the parties touching the question whether the term “market price” meant the price at the well or the price the gas would bring in a market remote from the well. We think it reasonable to assume that the parties intended that, if there was a market for gas in the field, the current market price there should be paid. There is where the gas was reduced to possession and there is where ownership of it sprang into existence. The result of bringing the gas to the surface of the ground in the field was to reduce to ownership there a commercial commodity. Previous to the moment the gas reached the surface of the ground, the parties owned nothing so far as the gas was concerned, except the right to explore for it and reduce it to possession and ownership. But when the gas reached the surface of the ground, the parties owned it in the proportion of one-eighth to the lessor and seven-eighths to the lessee, and, if it had been contemplated or provided in the lease contract that the gas should be divided in kind, it would hardly be disputed that the division should be made at the well. This lease provides that in case oil is discovered, it shall be divided in kind, one-eighth thereof to be delivered to the credit of the lessor “in the pipe line to which he (the lessee) may connect his wells.” The division of the oil is made at the well and the lessor’s one-eighth thereof is delivered to him there. In like manner, if the lease contract provided that the lessee should deliver to the credit of the lessor “in a pipe line which he may connect with his wells,” the equal one-eighth part of the gas produced, the division and delivery would take place at the well just as the division and delivery of tfie oil is made.
 

 The reason why the división and delivery is made at the well, in cases where there is to be a division in kind, is that there is where the parties come into ownership of the commodity, there is where title vests. The lessor and lessee are vested with title to the gas at the well or in the field in the same proportion as the oil is owned. And while there is to be no division of the gas in kind, it is nevertheless contemplated that there shall be a “division,” not of the gas in kind but of its
 
 value
 
 as fixed by the market price.
 

 Now if the division in kind, where such is contemplated, should be made at the place where ownership vests, it follows that the division of the value or proceeds of the gas should be made there, provided, of course, that the value of the gas can be determined, and that depends upon whether there is a “market price” for it in the field.
 

 The term “market price” does not mean an arbitrary price fixed by the lessee. “Market price” means, according to Webster, “the price actually given
 
 vn current market dealings.”
 
 (Italics here and elsewhere ours.)
 

 In Black’s Law Dictionary, the term “market price” is thus defined:
 

 “The actual price at which a given commodity
 
 is currently sold,
 
 or has recently been sold,
 
 in the open market,
 
 that is, not at forced sale, but in the usual and ordinary
 
 course of
 
 
 *915
 

 trade and competition,
 
 between sellers and buyers equally
 
 free to bargain,
 
 as established by
 
 records of late sales.”
 

 In Louisville & Nashville R. R. Company v. R. E. E. DeMontluzin Co., 166 La. 211, 116 So. 854, 855, it was said:
 

 “The market value means the fair value of the property between one who wants to purchase and one who wants to sell,
 
 under usual and ordinary circumstances."
 

 The “market value” of a commodity is the “price at which the owner of the goods or the producer holds them for sale; the price at which they are freely offered in the market to all the world; such prices as
 
 dealers in the goods are willing to receive, and purchasers are made to pay, when the goods are bought and sold in the ordinary course of trade.”
 
 Muser v. Magone, 155 U. S. 240, 15 S. Ct. 77, 81, 39 L. Ed. 135. See Words and Phrases, First Series, page 4383, under the heading “Market Value.”
 

 As to the price which the lessee was required to pay the lessor as a basis of settlement, the contract here, involved stipulates that he should pay one-eighth of the “value of such gas” calculated at the “market price,” which means the market price at the well or in the field and not the price which it would bring in a distant market.
 

 Counsel for plaintiffs, in support of their argument that “market price” means the price at which the gas was sold, cite the cases of Barton et al. v. Oil & Mining Co., 27 Okl. 416, 112 P. 965, and Ladd v. Upham (Tex. Civ. App.) 58 S.W.(2d) 1037, 1038.
 

 These cases do not support their proposition. The royalty clauses in those cases are not like the one in the case at bar. In neither of the cases was the lessee required to settle at the “market price” of the gas. In the Barton Case it was agreed that if gas was discovered, the consideration to the lessor should be “one-tenth portion of each gas well drilled on. the premises herein described when utilized and sold off the premises.” The court interpreted that to mean that the lessor was to receive a one-tenth portion of the proceeds of the gas when sold off the premises.
 

 In the case at bar, the lessor was not to receive a one-eighth “portion of the proceeds when sold off the premises,” but one-eighth of the market value of the gas.
 

 In the Ladd Case, the contract provided that “the lessee shall pay lessor as royalty one-eighth of the proceeds from the sale of gas as such.”
 

 In the case of Scott v. Steinberger, 113 Ran. 67, 213 P. 646, 647, the Supreme Court of Kansas held that under an oil and gas lease similar to the one in the present case, the contract should be construed to mean that the gas produced “should be measured and the price determined at the place where the wells were connected with pipe lines, and not at some distant market that might be found ait the end of a pipe line remote from the field and where the cost of transportation might equal or exceed the value of the gas produced.” A similar view was expressed by the Kentucky Court of Appeal in the case of Rains v. Oil Company, 200 Ky. 480, 255 S. W. 121.
 

 To hold that the lessors in this case should receive in settlement one-eighth (or one-sixteenth as they own only one-half of the mineral rights) of the gross price received by defendants for the gas, would, in effect, be to
 
 *917
 
 hold that it was the duty of the lessees to bear all the expense of carrying the gas to a market beyond the gas field. This would be directly contrary to our holding in the case of Coyle v. La. Gas & Fuel Co., 175 La. 990, 144 So. 737, which case was reaffirmed in Crichton et al. v. Standard Oil Co., 178 La. 57, 150 So. 668 (decided July 7, 1933, and not yet reported).
 

 In the Coyle Case, the lease provided that the lessor should receive as royalty one-eighth of the gas. The gas was so heavily impregnated with gasoline that it was worthless in its original state. The lessee piped the gas to an extraction plant owned by another where the gasoline was extracted from the gas. As compensation for extracting the gasoline from the gas so as to make the gas valuable, the lessee allowed the owners of the extraction plant to.retain two-thirds of the gasoline saved. The lessor contended that he should receive one-eighth of the gross proceeds of the gas and gasoline—that it was the duty of the lessee to bear the whole expense of converting a worthless commodity into valuable products. On first hearing, that theory was sustained, but on rehearing it was held that the lessor should bear his proportion of the expense of saving the gasoline and of rendering the gas valuable, or to quote paragraph 4 of the syllabus, “Under lease providing for one-eighth royalty for gas where gas only is found, lessor held liable for cost of extracting gasoline from gas in proportion to amount received by lessor.”
 

 The facts in that case are different from those in this case, but the principle involved is the same in this, that the lessee cannot be taxed with the whole cost of marketing the gas and extracting therefrom the gasoline.
 

 That, in sum, was the ruling of the trial judge in the present case. -He deducted from the price received by defendant the expense of piping the gas to the place where it was sold and held that what remained was the “market price” of the gas.
 

 His ruling would unquestionably be correct if as a matter of fact the gas had no “market value” in the field. But we find as a fact that it did. The testimony shows that there are several gas fields in the northern section of the state, East Texas, and South Arkansas, among them being the Rodessa, Sugar Creek, Cotton Valley, Elm Grove, Shongaloo, Greenwood or Waskom, Richland, and Ouaehita-Morehouse.
 

 It shows further that natural gas has a market value in each of the fields; that pipe lines have been built into each of them; and that the companies purchase gas in each of them at competitive prices. The testimony shows further that 4 cents per thousand cubic feet is the average price paid in these fields and that the price paid plaintiffs was based on that average. In the Elm Grove, Richland, and Ouachita-Morehouse fields, the price is 3 cents, but in some of the others it is 4 cents, and in one it is 5 cents. Therefore the price of 4 cents paid by defendant in this case was not an “arbitrary price” as suggested by counsel for plaintiffs, but the average price paid in the North Louisiana territory. That is the “market price” in the fields and must be accepted as the basis of settlement in this case.
 

 We find no merit in the contention that the lessees were entitled to none of the gaso
 
 *919
 
 line extracted from the natural gas. According to the expert testimony introduced in this case, practically all natural gas contains some gasoline which 'comes to the surface in the form of vapor. The presence of the gasoline in the natural gas, they say, is probably due to the fact that at some remote period, the gas came in contact with oil from which it took up “some of the lighter fractions.” Gasoline is therefore one of the constituent elements of “natural gas,” as that term is ordinarily used and understood. Act No. 252 of 1924 is an act to conserve the “natural gas” resources of the state, and in section 13 thereof, it is stated that “ ‘gas’- means natural gas as it is taken from the earth, including any gasoline content it may have.”
 

 This court, in Coyle v. Gas & Fuel Co., supra, stated, in fact held, that “the gasoline was part of the gas produced.” It has been so held by the courts of Oklahoma and Texas. See Humble Oil & Refining Co. v. Poe (Tex. Com. App.) 29 S.W.(2d) 1019; Lone Star Gas Co. v. Stine et al. (Tex. Com. App.) 41 S.W. (2d) 48, 82 A. L. R. 1299.
 

 The lessee owned, seven-eighths of the natural gas produced under the lease, which included all the constituent elements thereof, all that the gas contained.
 

 In the alternative, plaintiffs asked that, if it should be held that they were entitled to only one-eighth of the gasoline, they be paid the gross value thereof without deducting the expense of .extracting it from the gas.
 

 In this respect, this case is governed by the ruling in the Coyle and Crichton Cases, supra. But counsel say this case is distinguishable from those cases in that here it is shown that the'-gasoline was extracted by a simple- and inexpensive process; that a simple device-costing only $125 separated the gasoline from the gas. Counsel are mistaken. The simple and inexpensive device referred to was used near the well to “knock” the fluid contents, including the gasoline, out of the gas so that it could be correctly metered as required by state regulations. But the testimony shows that the fluid contents thus “knocked out” went back into the pipe line with the gas and were carried along with it to an expensive extraction plant where the gasoline was extracted. The fluid contents knocked out of the gas at the well included not only gasoline but water and had no commercial value.
 

 For the reasons assigned, the judgment appealed from is so amended as to reject plaintiffs’ demands in toto, and, as thus amended, it is affirmed, costs to be pa'id by plaintiffs.
 

 ROGERS, J., dissents.