HIGGINS, Justice.
 

 The lessor instituted this action to have forfeited and cancelled from the public records an oil and gas lease on the ground that the lessee and sublessee refused to pay the royalties alleged to be due him in accordance with the terms of the lease. In the alternative, the plaintiff asked for an accounting covering the alleged balance of the royalties said to be due under the lease from the operation of four gas wells by the lessee and two oil wells by the sub-lessee on the premises. The defendants denied that the plaintiff was- entitled to the claimed additional royalties under the lease and averred that the construction placed upon the provisions of the lease by the plaintiff was untenable. The district judge dismissed the suit and the plaintiff appealed.
 

 
 *236
 
 The plaintiff contends that a certain colorless fluid produced by the gas wells through separators is a high grade crude, oil resulting from the normal operation of the gas wells and, therefore, comes within the oil royalty clause of the lease and not the gas royalty provision thereof.
 

 The lessee contends that the colorless fluid produced by the gas wells through the means of separators is gasoline within the meaning of the provisions of the lease covering the payment of royalty on the gas produced frorn the wells and that as all of this royalty has been paid, the plaintiff’s additional claims for royalty are without' merit.
 

 The plaintiff brought the sublessee into the suit by a supplemental petition. The basis of the claim for additional royalty is that the sublessee sold the oil produced from the two oil wells on the premises at a price less than the p'osted price prevailing in the Sligo Field, without the plaintiff’s consent. The defense is that theré was not any posted price in the Sligo Field for crude oil and that the sublessee obtained the best possible price for the plaintiff’s oil, or the same amount as it did for its own, with his consent.
 

 We have carefully studied the voluminous record and the exhaustive briefs of the litigants and have reached the conclusion that the views expressed by the learned trial judge, in his original and supplemental opinions, are correct and, therefore, quote them with approval:
 

 “Plaintiff sued the Arkansas Louisiana Gas Company to cancel an oil and gas lease dated June 30, 1933, granted by plaintiff and now held by defendant, for failure to pay the royalty or rentals due thereunder. Plaintiff also sued the Triangle Drilling Company a sublessee of the other defendant, to whom had been sublet an undivided one-half interest in and to said lease insofar only as said lease affects and applies to the strata situated between a depth of 2,800 feet and 3,200 feet, under the allegation that this latter company also failed to pay the royalty on oil as provided in said lease, and, in the alternative, prays for an accounting from defendants.
 

 “The lease executed by plaintiff covers the following lands:
 

 “The North half (N%) of the Northwest quarter (NWj4) the Southwest quarter (SW^) of the Northwest quarter (NWj4) 5 the Northwest quarter (NWj4) of the Southwest quarter (SW^), and the South half (S%) of the Southwest quarter (SWj?4)> all in Section Eighteen (18), Township Seventeen (17) North, Range Eleven (11) West, Bossier Parish, Louisiana, containing 240 acres, more or less.
 

 “The lease stipulated a cash consideration, and additional bonus payable out of a part of the mineral produced from said lands (all of which has been paid) and also provided for the payment of the following royalties:
 

 “‘(1) To deliver to the credit of Lessor, free of cost, into the pipe line to which Lessee may connect its wells, or at Lessor’s option to storage by the Lessor provided - the equal one-eighth (1/8) part
 
 *238
 
 of all oil produced and saved from said leased premises.
 

 “ ‘(2) To pay to Lessor at the rate of Two Hundred ($200.00) Dollars per year, payable quarterly, for each well producing gas (whether casinghead gas or otherwise) while such gas is not being utilized or sold off the premises, whether before pipeline connection or during subsequent suspensions of withdrawal, but during the time such gas shall be utilized, or sold off the premises such royalty shall cease, and instead, the lessor shall be paid one-half of one cent (1/2 of 10) per thousand cubic feet of such gas production, including gasoline, whether recovered by drips, absorption plant or otherwise, corrected to two pounds (2 lbs.) above atmospheric pressure.’
 

 “The Triangle Drilling Company drilled a well producing crude oil and has paid a royalty thereon of 1/8 of the price received for the oil as sold, less 50 per barrel for transportation charges, while plaintiff is claiming in this suit a price some 170 to 200 per barrel as the posted price of like oil in the Sligo Field. The question here involved will be discussed secondly.
 

 “The defendant Arkansas Louisiana Gas Company, in 1936 or 1937, drilled four wells on the leased lands which produced, and are producing, a large amount of gas and a water white fluid which is now commonly called ‘distillate’. The gas contained a little less than 1/2 gallon per thousand cubic feet.
 

 “It is the plaintiff’s contention that this so called ‘distillate’ is ‘oil’ and should be accounted for as such under the royalty provision No. 1 of the lease, which grants unto plaintiff 1/8 of the oil produced and saved from the premises. It is defendant’s contention that the fluid is ‘gasoline’ and was accounted for under the second royalty provision, which provides a royalty of 1/20 per thousand cubic feet of such.gas production including gasoline, whether recovered by drips, absorption plant or otherwise, and which 1/20 per MFC had been regularly paid and accepted by plaintiff.
 

 “We will consider the case from four angles, i. e., the nature and character of the fluid produced; the form of oil and gas leases in use at the time; the jurisprudence relating to royalty provisions of oil, and gas leases; the action of the parties, and then our conclusions on the sub j ect.
 

 “We first make the statement that the remarks here made are not to be taken as a scientific discussion of oil and gas other than is necessary to determine a proper interpretation of the royalty provisions of a contract of lease between plaintiff and defendant. So far as we have been able to determine, there has been no oil and gas lease with a similar royalty provision as the one here involved that has been presented to the courts for a decision on the point here involved.
 

 “Considered in a broad sense there are two minerals covered by the lease in question ; one is oil and the other is gas. They are distinct.
 

 “Gas is defined as follows: ‘An aeriform fluid, having neither independent
 
 *240
 
 shape nor volume, but tending to expand indefinitely.’
 

 “Petroleum oil is defined: ‘An oil and inflammable liquid, almost colorless to black, consisting of complex mixture of hydrocarbons with small quantities of other materials, and existing in many cases in the upper strata of the earth.’
 

 “These are found at varying depths under the ground, and in varying quantities. When the production from a well is predominantly oil, it is called an oil well; and when the production is predominantly gas, it is called a gas well; the four Roy wells drilled by this defendant are so classed by the Conservation Commission and are operated as such under Act 253 of 1924.
 

 “Oil and gas will mix and when gas is present in an oil pool and comes to the surface with the oil in an oil well, the gas will have taken up^ some of the lighter hydrocarbons of the oil, which, when separated from the gas, is called ‘casing-head gasoline’ — and the gas, ‘casinghead gas’. When there is oil near a gas pool, some of the lighter hydrocarbons of the oil become dissolved in the gas. Plaintiff’s expert testifies, in substance, that a part of the oil vaporizes and passes into the gas and becomes a constituent part of the gas, while other parts of the oil, by reason of pressure and temperature, is dissolved, and passes into a gaseous phase, enters the natural gas and is suspended within the gas much the same as salt that is dissolved in water is suspended in the water, but does not become a part of the gas; that when the gas passes from the well head and the pressure and temperature reduced the dissolved gaseous oil is readily condensible and may be removed from the gas by a simple separator placed at the well, but that the part of the oil that was taken into the gas by reason of vapor pressure becomes a constituent part of gas. and is removable only by absorption plant, or other manufacturing process.
 

 “Defendant’s expert says, in substance,, that the lighter fractions of the oil, by reason of temperature and pressure, pass into gaseous phases and mix with gas, and. upon emerging from the well head and by a reduction of temperature and pressure the heavier fractions are readily condensible and may be removed by a separator,, drip or otherwise.
 

 “We do not see that there is enough difference between the experts, insofar as. the contract of lease here is concerned, to have referred to their separate statements,, for the reason that according to both experts, the fluid in gas comes from the oil, whether it enters the gas by reason of vapor pressure or otherwise and to answer the-question whether the fluid here involved comes from the gas family or the oil family, we think the parties agree that it comes, from the oil family, and to that extent only it is oil.
 

 “Oil, as it is commonly called, is composed of many constituent parts, such as gasoline, kerosene, naptha, asphalt, etc.,, but all oil does not have the same constituent parts. We note from the document' attached to plaintiff’s brief that Hosston. (Caddo) Crude and Bellevue (Bossier). Crude have no gasoline content. General
 
 *242
 
 ly speaking, however,- crude petroleum contains 25 to 35 per cent of gasoline. The Sligo Field, where these wells are located, has both oil wells and gas wells. The fluid, .according to the same pamphlet, contains as high as 85% of gasoline. The particular fluid involved here was tested for plaintiff, and several witnesses were asked whether it would meet the specifications for ‘Louisiana Approved Gasoline’ (Act 12 of 1934) and .the questions were answered in the negative.
 

 “In order to compare the fluid here involved with Louisiana Approved Gasoline, we will set out the specifications for the latter with the distillation record made of the fluid from the Roy wells, the figures representing degrees of temperature Farenheit:
 

 La. Approved Roy Roy Roy Roy Gasoline #1 #2 #3 #4
 

 'Initial Boiling Point 131 134 116 106 106
 

 '5% Recovery 186 166 164 150
 

 10% " 202 184 172 168
 

 20% 221 224 208 198 196
 

 30% " 242 224 216 218
 

 40% " 260 240 234 236
 

 50% " 284 276 256 250 258
 

 ■60% " 290 268 274 282
 

 -70% " 310 286 302 310
 

 •80% 328 314 338 354
 

 '90% " 392 366 352 396 432
 

 End Point 437 416 418 462 516
 

 Amount Recovered 95% 97.5% 97.8% 97.0% 97.5%
 

 Pércent Re•covered at 392 Deg. 90 S3.8 94.8 89.5 86.0
 

 “From the foregoing analysis it will be •seen that the fluid from the Roy Wells is almost identical with Louisiana Approved Gasoline, except that in Roy No. 4 the fluid is a little heavier at the end; requiring more heat to boil the end fractions ;han in the Louisiana Approved Gasoline. This difference, however, does not change the fluid into another substance. It is still gasoline. A simple illustration of what we are saying is this: Take a pine tree in the forest and saw it into planks, and say the specification for No. 1 lumber requires same to be free of knots. If any piece of the material had a knot in it, it would not be a No. 1 plank, but it would nevertheless be 'a plank.
 

 “A good deal of testimony was adduced to show by what name this fluid was commonly known in the oil industry prior to the time of signing the lease in question. The fluid began to be called ‘distillate’ about the year 1935. Prior to that time, some state that it was called ‘white oil’, and others state that it was ‘drip’ or ‘drip gasoline’; some say ‘condensate’ and in the early days it had no commercial value and was drawn out of the gas lines by means of ‘drips’ and burned or otherwise destroyed. However, some of it was used directly in automobile motors. Mr. Roy explains the difference between the fluid here in question and the fluid formerly known as ‘drip’ as follows:
 

 “ T would say that has reference to the stuff that comes in the drip, and that drip is liquid stuff. It is a form of gasoline. They call it drip because it is a drip of an inconsequential amount of stuff. I have never heard of it being saved, but it could be saved, and if saved, any land owner is entitled to % of the product of his well.’
 

 “Mr. Roy further testified that gas from an oil well, if compressed, would be gasoline ; and that drip out of a gas line would also be gasoline; that gas has a certain
 
 *244
 
 amount of natural gasoline in it, which requires an absorption plant or gasoline plant to remove it. ‘You cannot get it out any other way,’ (Evidence P. 44) he testifies that the so-called distillate is an entirely different fluid, and says:
 

 “ ‘The distillate is not in the gas. It comes out of the well with the gas at the same time. They both issue out of the well in the same pipe. All the separator does is to give them a chance to come apart. The gas still has in it a constituent part of gasoline that goes up to the absorption plant
 
 to get
 
 it out, but the distillate is not in the gas at-all.’
 

 “Again, Mr. Roy testified, Evidence p. 63, as follows:
 

 “ ‘All gas lines over the country on. the' wells that produce what we talk about as distillate, everyone that I know of has a separator at the well except those wells of mine. I do not know of any drip on that kind of a line between the well and the absorption plant — I cannot recall a solitary one. * * *
 

 “ ‘Now there were in years gone by when we got wells with an insignificant amount 'of distillate in them that had drip somewhere near the wells and that invariably was thrown away or bled out in the air or burned up. * * * ’
 

 “ ‘Q. Well do you mean by “drip” that it is distillate, or natural gasoline, or what ? A. If you analyze the drip you will find that it is not natural gasoline, but is similar to distillate.’
 

 “ ‘Q. Well do you consider that is the same sort of product that these four Roy wells are making and which you call dis-. tíllate? A. It is a product that might— it will list somewhere between — somewhere lower than natural gasoline that the gasoline plant gets out, in gravity, and it will list in the neighborhood of what these wells are making.’
 

 “In answer to another question he stated that everything that comes out of a well ‘is a crude oil substance and crude gas.’
 

 “From the foregoing resume of Mr. Roy’s testimony we think that his conclusions are:
 

 “(a) That gas has a constituent part called gasoline, which can only be removed by an absorption plant.
 

 “(b) That the distillate from his four wells is similar in character to the ‘drip’ taken from gas lines in former years and destroyed.
 

 “(c) That distillate is not ‘in’ the gas, but is brought up with or by the gas, and should be separated from the gas by a separator at the well.
 

 “(d) That all known gas wells producing distillate, except the four Roy Wells, have separators at the well for separating the gas and distillate.
 

 “(e) That the distillate is a crude oil substance, and a lessor should be paid his l/8th royalty thereon.
 

 “We think plaintiff’s expert, Mr. Fash, contradicts Mr. Roy’s evidence as to whether the distillate is ‘in’ the gas. Mr. Fash stated that the distillate in the ground ‘is in the form of gas; it is an oil in solution in gas;’ and again, that the distillate ap
 
 *246
 
 pears in gas in two conditions, ‘solubility’ and ‘vapor pressure’ relations. Mr. Fash explains that the distillate by reason of temperature and pressure is dissolved in the gas the same as a spoonful of salt may be, dissolved in a bucket of water. Therefore, we think that the distillate is a gas in the formation underground,
 

 “Oil and Gas Lease Forms.
 

 “Oil and gas lease forms have been adopted and changed as conditions in the oil and gas industry have progressed, or as the courts have construed existing lease contracts. Plaintiff filed in evidence a number of these forms to support his contention that the so-called distillate should be paid for as oil, and, we w'ill discuss some of these forms. In the early days the form of oil and gas lease used was one providing a royalty of l/8th of the oil produced and saved, and $200.00 per year for each well producing gas. See Wemple v. Producers’ Oil Company, 145 La. 1031 [83 So. 232], The producer did not pay any royalty on casinghead gasoline (gasoline from gas from an oil well), but after that case was decided, a form was adopted (Bath’s Form No. 9) which carried three provisions for the payment of royalties:
 

 “(1) l/8th of the oil produced and saved:
 

 “(2) A stipulated sum per year for the gas from each well where gas only was found while the same was used off the premises.
 

 “(3) A stipulated sum per year for the gas produced from an oil well where the same was used in the manufacture of gasoline.
 

 “When gas became to be more valuable, Form No. 10 was adopted and the royalty on gas (No. 2 above) was. changed so as to pay the lessor 1/8 of the value of the gas, calculated at so much per thousand cubic feet. The royalty provision for oil and gas from an oil well remained the same. This form was revised, as will be mentioned later. Form No. 14 appears to be the same with respect to the royalty provisions. This lease must have been adopted in the 20’s, as it has a printed date of ‘192 — .’ Form 14A dropped the third royalty provision relating to gas from an oil well and included same in the provision for royalty on gas from a gas well as follows :
 

 “ ‘2. To pay to lessor $300.00 each year for each well producing gas (whether casinghead gas or otherwise) until such time as gas shall be utilized or sold off of the premises, * * * thereafter lessor shall be paid 1/8 of the value of such gas in its natural state (including gasoline whether same be recovered by drips or through absorption plants or by other process) calculated at - cents per thousand cubic feet * * *.’
 

 “Bath’s Forms No. 10 and - No. 12 were in use in 1933, according to the testimony of Mr. Roy, which were the only two forms presented to him by counsel. (Evidence p.
 
 74)
 
 These forms, after providing for l/8th royalty on oil, follow with only one other royalty clause reading as follows:
 

 “‘(b) On gas, including casinghead gas and other vaporous or gaseous substances, produced from said land, as follows: In case lessee shall itself use gas in the man
 
 *248
 
 ufacture of gasoline or other products therefrom 1/8 of 25% of the market value at the plant of the gasoline or other products manufactured therefrom quantity to be ascertained in a manner recognized by the industry in case lessee shall sell gas at the wells, 1/8 of the amount realized from such sales; and, in all other cases when sold or used off of the premises, the market price at the well of l/8th of the gas so sold or used.’
 

 “Form No. 14A — Rev. Jan 1932, must also have been in use according to the date printed on the form, providing $200.00 per year for each well producing gas (whether casinghead gas or otherwise) when the gas is not being sold or used off of the premises and then:
 

 “ ‘but during the time such gas shall be utilized or sold off of the premises the royalty above named shall cease and the lessor shall be paid one-eighth of the value of such gas in its natural state (including gasoline, whether same may be recovered by drips or through an absorption plant or by any other process) calculated at the rate of - cents per thousand cubic feet, corrected to two pounds above atmospheric pressure * *
 

 “It is stated that the lease here in question was ‘written’ and it appears to have been copied from Form 14A — Revised, with the royalty clause on gas changed from that as printed in the form to that in the lease as signed by plaintiff.
 

 “The plaintiff also offered in evidence lease covering the ‘Jeter Well’ in the Sligo Field, together with royalty statement covering the gas and fluid obtained from the well, from which it is noted that the royalty clause in the lease provides for a royalty of 1/8 of the oil;
 
 5‡
 
 per MFC for the gas; and
 

 “ ‘Second, pay lessor for all gasoline extracted, manufactured or recovered by lessee from natural gas or casinghead gas produced from the premises leased herein, one-eighth of the net proceeds derived from the sale of.such gasoline
 
 *
 
 * deducting
 
 2‡
 
 per gallon for the cost of manufacturing said gasoline.’
 

 “The remittance sheet shows that the royalty was calculated on the basis of the amount of gas, to which was added the amount for the gasoline sold, and on the reverse side of the sheet it is shown that no deduction was made for -the ‘cost of manufacturing, extracting or recovering-said gasoline’ as the gasoline was not recovered through any plant or manufacturing process. If plaintiff’s lease had contained the same royalty provision for gas, and gasoline he would have been, without question, entitled to royalty on the fluid here involved.
 

 “Jurisprudence Relating to Oil and Gas. Lease Royalties.
 

 “In Wemple v. Producers’ Oil Company, 145 La. 1031 [83 So. 232], the court considered and allowed plaintiff’s claim for royalty on casinghead gasoline under an oil and gas lease which provided a royalty of l/8th of the oil produced and saved, and. $200.00 per year for the gas from each well when used off of the premises. There was. nothing in the contract above casinghead
 
 *250
 
 gas or gasoline, or the extraction of the one from the other by means of a plant erected on the surface of plaintiff’s land. The court held that the gasoline was a component part of the oil and since plaintiff was entitled to l/8th of the oil, and had not otherwise disposed of his interest in the casinghead gasoline, and since the lessee had the right to take all of the constituents of the oil, both heavy and light, should pay for what he takes. The court said there was nothing to prevent an owner from selling to one person the right to take such oil as he can bring to the surface -in liquid form, and to another the same oil that can be brought up only in a vapor- — -and, if this be true, there is nothing to prevent the same owner from making a contract with the same lessee for a royalty on all products on any basis that they may agree upon.
 

 “In Wilkins v. Nelson, 155 La. 807 [99 So. 607, 609], plaintiff sued to set aside a lease on the ground of lesion. Plaintiff sold all of the minerals under his land for $900.00 cash and l/8th interest in the oil produced and saved. Lessee produced large quantities of gas from which was obtained 666,261 pounds of carbon and 60,000 gallons of gasoline worth upwards of $200,-000.00. The court inter alia said:
 

 “ ‘We know of no law and have been referred to none which would require the delivery of gasoline when the obligation called for the delivery of oil in its crude or natural state. Gasoline may be of the same generic species or family of minerals as that of oil, but it c-annot be classed as oil or substituted for oil within the intent and meaning of the word “oil” as used in the contract of sale.’
 

 “In Coyle v. Louisiana Gas & Fuel Company, 175 La. 990, 144 So. 737, the court considered and allowed plaintiff’s claim for royalty on gasoline extracted from gas produced from a gas well. The lessee provided for royalty of 1/8 of the oil, and for gas produced from an oil well when used off of the premises for the manufacture of casinghead gasoline — neither of which was produced, and for a royalty on gas as follows:
 

 “‘(2). To pay the lessor one-eighth royalty for the gas from each well where gas only is found,-while the same is being used off the premises.’
 

 “There was nothing said in the contract with reference to gasoline to be recovered from the gas produced from a gas well. The record indicates that all of the gasoline was extracted by means of an absorption plant, not erected on the leased premises as in the Wemple case. The decision in effect holds that the gasoline extracted was not a component part of the gas. and that the price paid for the gas did not include with it payment for the gasoline and allowed plaintiff to recover the same, less the cost of extraction, that is 1/8 of 1/3 of the value of the gasoline (2/3 being allowed for the cost of extraction). The effect of this decision is in accord with the Wemple case.
 

 “In Wall v. United Gas Public Service Company, 178 La. 908, 152 So. 561 [562], the court had for consideration a lease that provided for royalty on gas in the following words:
 

 
 *252
 
 “ ‘The grantor shall be paid one-eighth (1/8) of the value of such gas calculated at the market price per thousand feet, corrected to two pounds above atmospheric pressure/
 

 “The lessor was paid 40 per MFC and for the gasoline extracted therefrom, less the cost of manufacture. Defendant sold the gas about two miles from the well for 5.80 per MFC. Plaintiff claimed that he was entitled to be paid on the basis of the ‘sale price’ of the gas and for all of the gasoline. The court held the ‘market price’ meant the price at the well instead of at the point of delivery. Plaintiff’s demands were rejected because he had been paid the market value of the gas at the well, this was fixed on the basis of 40 per MFC for the dry gas and 1/3 of the gasoline content (allowing 2/3 of the gasoline as the cost of extraction). This method of calculating the value of wet gas was followed in the case of Tyson v. Surf Oil Company [195 La. 248], 196 So. 336.
 

 “In the case of Mid-Continent Petroleum Corporation v. Blackwell Oil & Gas Company [159 Old. 35] 15 P.2d 1028 [1030], the court had for determination who was entitled to the gasoline taken by the Gas Company from the drip. The Oil Company had sold to the Gas Company all of its gas rights under an oil and gas lease wherein the royalty provision foi; gas was to pay lessor $300.00 per year for the gas from each well where gas only was found, while the same is being used off the premises. The Gas Company agreed to pay the lessor the royalty specified in the lease and to pay to the Oil Company ‘at the rate of
 
 7
 
 (seven) cents per thousand cubic feet for one-eighth (1/8) of the volume of gas taken by it.’ The Gas Company drilled two wells, the first was operated awhile as a gas well and then drilled to a greater depth and completed as an oil well. The second was a gas well producing gas with a gasoline content of about 1/2 gallons per thousand cubic feet of gas. This gasoline was extracted from the gas by means of a ‘pinch gate’ called a drip. The question up for the court’s determination was, Who was entitled to the gasoline taken by the gas company from the drip ? By a divided court, after three opinions had been prepared, it was held that from the contract as written it did not appear that' the Gas Company which purchased only ‘gas’ was entitled to the gasoline content that was readily condensible out of the gas without the use of equipment commonly used for the manufacture of gasoline. In other words, the term ‘gas’ did not include a fluid which was readily condensible out of the gas without a manufacturing process.
 

 “In the case of Southern Minerals Corporation v. Simmons [5 Cir.] 111 F.2d 333, the plaintiff sought an injunction against the defendants from wasting gas from a well, which they alleged was a gas well, on the ground that the gas waste was in violation of the orders of the Railroad Commission. According to the statement of fact in the record, the court said that the well produced 280 barrels of fluid and 6,-500,000 feet of gas (2 gallons to the MFC) and further broke this down by stating that there were two separators near the well head and the first separator caught approximately 151 barrels of liquid, that was of
 
 *254
 
 a dark straw or brown color, ‘and this product comes from the flow line into the separator without benefit of choke or any character of manufacturing device.’ From the first separator the gas was carried over to a second separator, and with a substantial drop in temperature and pressure, approximately 70 barrels of water white fluid was caught. The drop in temperature and pressure between the separators was brought about by a choke and other devices. The fluid obtained in the first separator was produced just as any other high pressure oil well is produced in that field. The liquid was dark brown and caught in a separator without benefit of choke or manufacturing device. ‘This liquid so produced is oil.’ The liquid referred to was more than twice the amount of the water-white fluid obtained through 'the second separator. The court did not further discuss the water-white fluid, but held that on the basis of the liquid obtained in the first separator, that the well in question was an oil well, and that the gas produced therefrom was appurtenant to the oil rights, and that the defendants owned the gas necessary for the production of the oil. Plaintiff’s demands were rejected on the ground that the Railroad Commission had the exclusive jurisdiction to regulate and control the production from an oil well.
 

 “In the Clymore case [Clymore Production Co. v. Thompson, D. C.] 13 F.Supp. [469] 470 [471], the court held:
 

 “ ‘We think it manifest that the Legislature in speaking of crude petroleum oil meant a liquid existing in the ground as oil and as such produced from it. It is our opinion that this condensate or distillate caught in complainant’s separators is not crude petroleum oil within the contemplation of the statute.’
 

 “Acts of the Parties.
 

 “Plaintiff is an experienced oil man, having drawn many leases, and drilled many oil wells, was present when one or more of the wells on his land were brought in and knew that they produced a large amount of wet gas and distillate, received his royalty check in payment of gas only (for about three years), without complaint on his part because the distillate was not included, until just shortly prior to this suit. Plaintiff knew that the distillate was not being removed from the gas by means of a separator at the well, as all other producers, including defendant, operate other wells. Defendant’s reason for not using the separator at the' well being that it was not required to account to plaintiff for the distillate or gasoline, as in other leases generally in use. Plaintiff has had considerable business dealing with the defendant, and in writing to defendant about one transaction, he referred to this lease by stating that:
 

 “ ‘Please permit us to point out another source of revenue closed to us by your company. Of course you don’t know about a specially worded lease given your company or the agreement supporting'it, exempting your company from paying us any gasoline royalty on the' Roy lands in Section 18, Twp. 17 N. Range 11 West, Sligo Field * *
 

 “Conclusions.
 

 “If arguendo it is conceded that the fluid produced from plaintiff’s land by the
 
 *256
 
 Arkansas Louisiana Gas Company is gasoline, nevertheless the contract of lease ■covered only that part of the gasoline that is in the gas by virtue of vapor pressure, ■and, which could be removed only by means ■of an absorption plant. The contract of lease does not so limit the quantity or character of the gasoline that was conveyed with the gas produced at 1/2^ per thousand cubic feet. The lease conveys the gas ■at 1/2{S per MFC including gasoline whether recovered by drips, absorption plant or ■otherwise. This certainly includes more gasoline than the part that can only be recovered by means of an absorption plant. 'The terms of the lease as to gasoline recovered is all inclusive. Hence plaintiff is not entitled to royalty thereon, and having been paid all royalty as provided in this lease, he is not entitled to have the lease ■cancelled, and his demands in that respect .are denied.
 

 “Claim Against Triangle Drilling Co.
 

 “The wells drilled on plaintiff’s land by the Triangle Drilling Company, under the sublease from the Arkansas Louisiana Gas Company, are oil wells. Plaintiff is ■entitled to l/8th of the oil produced. Under the lease, the defendant, does not become the owner of the royalty oil, but was under obligation to deliver same into the pipeline, or at lessor’s option to storage provided by lessor. The Triangle Drilling Company is a producer and not a purchaser ■of oil. For a time there was a pipeline operated from the Sligo Field, and the own■er thereof purchased the oil from the Triangle wells, but later cased to purchase oil or operate the pipeline. The Triangle Drilling Company purchased the pipeline extending from Sligo to Shreveport, but not being a refiner of oil, had to find a market for the oil produced, and after considerable effort was able to find a purchaser for same, whereupon the royalty owners (of the Skannal well), including plaintiff, executed a division order by the terms of which, the Triangle was to become the owner of the royalty oil as soon as it was produced, and which was to be paid for as follows:
 

 “ ‘The oil received in pursuance of this division order shall be paid for * * * at the price received in the Sligo Field, or if sold for delivery to Shreveport at the price received for such oil in Shreveport, less
 
 ,05‡
 
 per barrel transportation charge.’
 

 “There is no contention made that the Triangle Drilling Company had not paid for the oil in accordance with the terms of the division order (covering the Skannal well). The only complaint is that the price received (from the Roy wells) is less than that received for oil of like quality in other nearby oil fields. * * *
 

 “For the reasons assigned, the demands of plaintiff are rejected at his costs.” (Parenthesis ours.)
 

 *****
 

 “Plaintiff is the owner of all of the royalty under the lease here in question and is the owner of a part of the minerals under the Skannal Well, both wells being operated by the Triangle Drilling Company and
 
 *258
 
 both being situated in the Sligo Field, where there are no pipe-line connections, other than the pipeline purchased by the Triangle Drilling Company. The oil from the Roy well is subject to the same market condition as the Skannal well, with reference to the sale of oil in the field. A division order was signed by all parties in interest under the Skannal well, and no division order was signed with respect to the Roy well. As stated, the conditions prevailing in the field with reference to a market for the oil are the same with respect to both wells. Plaintiff agreed in writing (the division order) for the sale of the oil from the Skannal well under the terms that Triangle is paying for the oil and has never complained about not being paid the posted price for the oil from his wells, therefore, the conditions being the same, as referred to under the division order, the plaintiff is not entitled to have the lease here in question cancelled * *
 

 It is clear from a reading of the district judge’s opinions that his conclusions are based upon the true meaning of the gas royalty and oil royalty clauses of this lease. The evidence supports the finding of the trial judge that under the particular royalty clauses placed in the lease, the parties contemplated that the distillate produced by these gas wells was to be paid for by the lessee under the gas royalty clause of the lease and not under the oil royalty clause thereof.
 

 For the reasons assigned, the judgment appealed from is affirmed at the appellant’s costs.