**Barton W. FREELAND et al., Appellants,**

v.

**SUN OIL COMPANY and Cities Service Oil Company; Sohio Petroleum Company, Intervenor, Appellees.**

**No. 17805.**

United States Court of Appeals
Fifth Circuit.
March 24, 1960.

Rehearing Denied April 21, 1960.

Victor A. Sachse, Breazeale, Sachse, Wilson & Hebert, Baton Rouge, La., for plaintiffs-appellants.

Austin W. Lewis, Cullen R. Liskow, Lake Charles, La., for defendants-appellees and intervenor-defendant-appellee. Liskow & Lewis, Lake Charles, La., of counsel.

Before JONES, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The basic question is whether a Louisiana mineral lessor's ⅛ gas royalty is to be based on 100% of the liquids extracted by an independent gasoline processing plant or on only that portion deliverable to the mineral interest owners after the processor has taken its share. Stated more simply, is the lessor to bear any part of the cost of processing? For if the basis is 100%, the result is that the lessor bears none of the costs. If the basis is the quantity remaining after the processor has taken its share, the lessor bears his proportionate part (e. g., ⅛) of the processor's share.

The District Court, on summary judgment, held that under the leases involved, the lessor must bear his prorata cost of processing. On the controverted issue reserved for trial, the Court, after trial, held that the processing costs chargeable under the processing agreement were not shown to be unreasonable. It therefore held in favor of the lessee-oil companies and against the lessor-royalty owners. We agree as to both actions.

As the primary question is one of law turning on the application of the lease contracts, the facts may be severely compressed. To secure maximum recovery of the minerals in the Egan Field of Acadia Parish, Louisiana, the Louisiana Conservation Commission pursuant to

statutory authority ordered a unitization of large numbers of separate tracts and leases. This required the installation and maintenance of a recycling operation. In recycling, the gas flowing through the wellhead is first stripped of recoverable liquids. The dry gas remaining, quite appropriately called "residue gas" is used in two ways. A part may be sold and delivered to gas transmission concerns for resale as fuel to domestic or industrial users. The other portion, in the quantities and methods prescribed by conservation authorities, is then subjected to high pressure in the compressor plant and thereafter reinjected into the earth for repressurizing of the natural reservoir.[1] This recycling has to do with production of both gas and oil. It is a cost of production and the lessees have borne this without any attempted apportionment to the lessors.

We are not here concerned with royalty on the residue gas. That portion returned to the reservoir appears to be royalty-free under the lease.[2] On that portion sold, full royalties have been paid. What we are concerned with is the products obtained by the extraction process. This related to that step we briefly characterized above as gas being "stripped of recoverable fluids." These products comprise the heavier hydrocarbons reduced to a liquid state.

The liquid content of the gas is not separated on the leased premises. On the contrary, it is carried with other full stream gas to the processing plant. At the processing plant, the gas first goes through an inlet separator which removes the condensate from the full stream gas. As there are still heavier hydrocarbons remaining, the gas flowing out of the separator is sent to ab-

sorption towers where additional liquids are absorbed out. The residue gas is then sent through a dehydrator and is delivered to the pipe line company or returned to the recycling plant for reinjection into the reservoir. The liquids recovered from the inlet separator and absorption tower steps are then further processed through the fractionator to obtain propanes, butanes, motor fuel, and other products.

The processing plant is not owned or operated by either the lessor or lessees. It is owned by the Acadia Corporation, a corporation owned by an enterprise having extensive experience and technical competence in gas plants. The plant is an expensive and substantial industrial installation. It cost approximately $1,800,000. It was built by Acadia to handle the gas from this field after prolonged negotiations with the lessee-oil companies. Acadia, the processor, receives under the processing contract as compensation for building and operating the plant 35.7% of the end products. The balance, 64.3% is returned to the lessees. The lessee-oil companies have paid the $\frac{1}{8}$ royalty on this 64.3%. What is at issue is the royalty on the 35.7% retained by Acadia, the processor.

We are not confronted with the question which plagues so many early cases, here and elsewhere, whether a lease covering gas and providing for payment of royalties for gas would encompass liquid products obtained from gas. Union Producing Co. v. Pardue, 5 Cir., 1941, 117 F.2d 225; O'Neal v. Union Producing Co., 5 Cir., 1946, 153 F.2d 157, certiorari denied, 329 U.S. 715, 67 S.Ct. 46, 91 L.Ed. 621; Arkansas Natural Gas Corp. v. Sartor, 5 Cir., 1938, 98 F.2d 527; see 3a Summers, Oil & Gas, §§ 595,

---

1. One of the conservation orders points out that approximately 3,000,000 barrels of oil, as well as substantial quantities of other hydrocarbons, would be recovered which would otherwise have been lost through retrograde condensation. Although in quite a different context the recycling-processing operation is described at length in Scofield v. LaGloria Oil & Gas, 5 Cir., 1959, 268 F.2d 699,

certiorari denied, 361 U.S. 933, 80 S.Ct. 372, 4 L.Ed.2d 355.

2. The leases provide:
"Lessee shall have free use of oil, gas, coal and water from said land except water from Lessor's wells for all operations hereunder, and the royalty on oil, gas and coal shall be computed after deducting any so used."

596 (1958) and § 596 (1959 Supp.). For the leases involved here expressly reserve royalties on gas in its gaseous state as well as gas used in the manufacture of gasoline and other products. The problem is not *what* is covered, i. e., conveyed by the grant. The problem is *how* is the royalty interest to be measured in the gas thus conveyed?

The answer must be found in the contracts which provided:

> "The royalties to be paid by Lessee are: * * * (b) on gas, including casinghead gas or other gaseous substance, produced from said land and [1] sold or used off the premises or in the manufacture of gasoline or other products therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on [2] gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale * * *." [3]

The lease, quite plainly, thus makes separate provision for two main situations: first, where the gas is [1] "sold or used off the premises"; and second, where it is [2] "gas sold at the wells." On the latter [2], the royalty is the specified fraction of the *amount* actually received. But where the gas is [1] sold or used off the premises, it is the "market value at the well" of gas so sold or used.

Here the record is uncontradicted that prior to the making of the processing contract with Acadia, the gas at the wellhead had little marketability and hence no demonstrated market value. As gas had to be repressurized for reinjection into the reservoir, the gas operations, apart from increased *oil* recoveries, would be productive only to the extent

that liquefiable components could be extracted in the course of the passage of the gas from wellhead through compressor and reinjection into the reservoir. In other words, if all of the gas and its components were restored to the reservoir, nothing of value would be obtained from the gas. To achieve recovery of liquid components with maximum efficiency, a modern, expensive gasoline extraction plant was essential. Quite obviously then the value of the raw, wet gas in its relatively unmarketable state at the wellhead was not equivalent to the price which the end product of that industrial process would command. The wet gas was important. Indeed, it was the indispensable raw material. But the availability of the extracting process and its application enhanced the value of the gas. The enhancement is of the value of the gas at the wellhead, not at a subsequent point, much as would be the case in the comparative availability of pipe line connections for ordinary gas.

In determining the market value of such gas at the well where there is no established criteria of a market, the Louisiana approach, which is binding on us, is to consider the end product of the extraction process as a factor. But it is a factor in reconstructing a market value at a place where in fact there was no, or little, market and consequently an appropriate deduction must be made.

The first case was Coyle v. Louisiana Gas & Fuel Co., 1932, 175 La. 990, 144 So. 737. After first holding that the lessor-royalty owner was entitled to royalty on 100% of the products of the extraction plant, the Court on rehearing held that the royalty should be computed on the basis of that portion of the end products which were returned by the proces-

---

3. Subparagraph (a) prescribed the royalties for oil as follows:

"(a) On oil, one-eighth of that produced and saved from said land, the same to be delivered at the wells or to the credit of Lessor into the pipe line to which the wells may be connected; Lessee may from time to time purchase any

royalty oil in its possession, paying the market price therefor prevailing for the field produced on the date of purchase;."

For ease in discussion, we have inserted the brackets [1] and [2] in subparagraph (b) quoted above in the text covering gas.

sor under the processing contract.[4] The Court proceeded from the point of view that where large expenditures make a valueless commodity one of great value, the contract would be harsh unless the costs were shared. Consequently, it was proper that the contract should be construed, if possible, to avoid that result. The Court then declared that "the law would step in, as a part of the contract" to say whether the royalty should be delivered free of costs. "This," the Court said, "we think the law has done by providing, in effect, that the cost of extraction, incurred by the lessee, to preserve the gas and its gasoline content, by making both merchantable, should be deducted before computing and delivering the lessor's royalty." 144 So. at page 743.

This was followed by Crichton v. Standard Oil Co. of La., 1933, 178 La. 57, 150 So. 668, 669. The Court described the royalty provisions as follows. "It is seen that the oil royalty is one-eighth of the oil to be delivered and stored on the premises, and the gas royalty is one-eighth of the market value of the gas sold or used off the premises for the manufacture of gasoline." The gas was sold by the lessee to the processing company for which the processor paid ⅓ of the market value of the end products. As in the Coyle case, the gas "was worthless until rendered valuable by the process of extracting the gasoline from it—a process that required the use of certain plant facilities that were not available to the [lessee oil companies]." The Court recognized that royalty was to be *paid* in money on the basis of "market value" rather than delivered in kind as in Coyle. But it regarded this as a "difference * * * more favorable to the [lessees] than was presented in the Coyle Case * * *" since the royalty was

based "on the market value of the wet gas, and it is shown that there was no market value for that gas in its natural state." The Court nevertheless adhered to Coyle and held that the lessor was due royalty only on the ⅓ part of the products deliverable by the processor.

Of decisive importance is Wall v. United Gas Public Service Company, 1934, 178 La. 908, 152 So. 561, 562. With respect to gas utilized or sold off the premises, the lease provided that the lessor "shall be paid one-eighth (⅛) of the value of such gas calculated at the market price per" m.c.f. The lessees sold the gas to a pipe line at a point two miles from the well at 5.8 cents m.c.f. It extracted gasoline which it sold at the market price. The lessee paid royalty on the basis of 4 cents m.c.f. for the gas sold, and on the gasoline extracted at the market price less costs of extraction. The lessor claimed royalties on the gas at the price for which it was sold (5.8) and on gasoline without deduction for cost of extraction. After emphasizing that in Coyle and Crichton "the gas was so heavily impregnated with gasoline that it was worthless in its original state," the Court makes it clear that the absence of such a mineralogical factor does not result in a different rule of law. "The facts in that [Coyle] case are different from those in this case, but the principle involved is the same in this, that the lessee cannot be taxed with the whole cost of marketing the gas and extracting therefrom the gasoline." 152 So. at page 564.

In a precise sort of way, the Court also demonstrates that the Louisiana approach is the effort to reconstruct a market value. As to the gas sold at a remote point (at 5.8 cent m.c.f.) the Trial Court allowed the lessor royalty on the

---

4. The Court described the royalty obligations as follows. "(2) To pay the lessor one-eighth royalty for the gas from each well where gas only is found, while the same is being used off the premises. (3) To pay the lessor for gas produced from any oil well and used off the premises, or for the manufacture of casinghead gas, one-eighth royalty for the time during which such gas shall be used." The processing contract with the lessee's subsidiary company gave the processor ⅔ and the mineral owners ⅓ of the products. No mention was made of "market value" or "price."

basis of that price less the reasonable expense of transporting the gas from the wellhead to the point of sale. This produced a "market price" somewhat less than 5.8 but somewhat more than 4 cents as paid by the lessee. The Court recognized that this process of reconstruction was proper. Such "ruling", the Court stated, "would unquestionably be correct if as a matter of fact the gas had no 'market value' in the field. But we find as a fact that it did." 152 So. at page 564. The Court analyzes the evidence and declares that there was a market at 4 cents, and since that was the "market price" in the field, it had to be accepted as the basis of settlement in the case. 152 So. at page 565.

The Court in the plainest of language reaffirmed its earlier determination that a "lessor should bear his proportion of the expense of saving the gasoline and of rendering the gas valuable * * *." And it held that under leases of the type involved here, the lessor is "liable for cost of extracting gasoline from gas in proportion to amount received by lessor." 152 So. at page 564.

These principles were applied in Tyson v. Surf Oil Co., 1940, 195 La. 248, 196 So. 336, 339. The Court points out there was "no direct evidence in the record to prove the market price of gas" in the particular field. The gas was "wet gas." Its market value, the Court stated, "is to be determined by considering the value of the gas from the standpoint of fuel, plus the value of the gasoline content." And then in great detail the Court goes through the mathematical process of making the separate determination of the two components (liquid hydrocarbons and residue gas) to arrive, after adding the two of them together, at the total market value. The calculations reflect a deduction for the extraction or processing charge.

■ The principle [5] is much more pervading than the lessors would recognize. It is not, as they claim, limited to the extraction cost necessary to make an absolutely *worthless* thing (gas) into something of value. It stands for the proposition that in determining market value costs which are essential to make a commodity worth *anything* or worth *more* must be borne proportionately by those who benefit. To put it another way: in the analytical process of reconstructing a market value where none otherwise exists with sufficient definiteness, all increase in the ultimate sales value attributable to the expenses incurred in transporting and processing the commodity must be deducted. The royalty owner shares only in what is left over, whether stated in terms of cash or an end product. In this sense he bears his proportionate part of that cost, but not because the obligation (or expense) of production rests on him. Rather, it is because that is the way in which Louisiana law arrives at the value of the gas at the moment it seeks to escape from the wellhead.

■ Whether the costs of extraction (35.7%) payable to the processor are regarded as such, or perhaps may more properly be considered as an element in the retrospective reconstruction of a market value at the wellhead, the question of the reasonableness of the amount is the same. And as such, it is a question of fact on which the Trial Court's findings have the insulation of F.R.Civ.P. 52(a), 28 U.S.C.A. These are not shown to be clearly erroneous. The Trial Court was eminently justified in regarding the transaction between the lessees and Acadia as one made at arm's length between businessmen negotiating vigorously for their partisan advantage. Neither fraud nor want of good faith nor arbitrariness, as such, is charged. Other leases, processing agreements, unitization contracts, recycling operation agreements conducted in other fields by other companies in Louisiana were received as bearing on the question of rea-

5. All of the cases are reviewed in Roy v. Arkansas-Louisiana Gas Co., 1942, 200 La. 233, 7 So.2d 895. Also see 16 Tulane L.Rev. 634 (1942); 15 Tulane L. Rev. 262, 265–270 (1941).

sonableness. The Court weighed them and found these circumstances to be wanting in probative force. Considering the variables in fields, operating and mineralogical conditions, relative position and economic strength of the parties to them, we cannot say it was in error.

The District Judge, trained and experienced in Louisiana law, was right on the law and summary judgment was correct. On the factual issues reserved for trial, his findings easily pass scrutiny and may not be rejected by us.

Affirmed.